**STATE OF UTAH, By and Through its DIVISION OF STATE LANDS, Appellee,**

v.

**Thomas S. KLEPPE, Individually and as Secretary of the Interior of the United States, Appellant.**

No. 76–1839.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted April 20, 1978.

Decided Aug. 8, 1978.

Rehearing Denied Dec. 6, 1978.

Carl Strass, Atty., App. Section, Justice Dept., Washington, D. C. (Peter R. Taft, Asst. Atty. Gen., Washington, D. C., Ramon M. Child, U. S. Atty., Salt Lake City, Utah, and Raymond N. Zagone, Gerald S. Fish and Dirk D. Snel, Dept. of Justice, Washington, D. C., on brief), for appellant.

Richard L. Dewsnup, Sp. Asst. Atty. Gen., Salt Lake City, Utah, (Vernon B. Romney, Utah Atty. Gen., Robert B. Hansen, Deputy Atty. Gen., Dallin W. Jensen, Asst. Atty. Gen., and Clifford L. Ashton, Sp. Asst. Atty. Gen., Salt Lake City, Utah, on brief), for appellee.

Frank J. Allen of Clyde & Pratt, Salt Lake City, Utah, for amicus Justheim Petroleum Co.

Guy G. Hurlbutt, Deputy Atty. Gen. of Idaho, Boise, Idaho, (Wayne L. Kidwell, Atty. Gen. of Idaho, and Peter E. Heiser, Jr., Chief Deputy Atty. Gen. of Idaho, Boise, Idaho, on brief), for amicus State of Idaho.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

The United States, by and through the Secretary of the Interior (Secretary) appeals from a summary judgment granted in favor of the appellee, State of Utah (Utah) enjoining the Secretary to approve or disapprove no later than December 15, 1976 (since stayed) Utah's school land grant "indemnity selections" of 194 parcels of public lands embracing approximately 157,255.90 acres situate in Uintah County, State of Utah. The surveyed "indemnity selections" or "lieu lands" are for school land grants-in-place which were denied Utah because of federal pre-emption, private entry prior to survey, or before title could pass to the state.

The historical background leading to Congressional enactment of the state school land grant statutes should aid in lending perspective to the legislative intent.

■ There were no federal lands within the borders of the original thirteen states when they adopted and ratified the United States Constitution. Thus, virtually all of the lands within their borders were subject to taxation, including taxation necessary for the maintenance of their public school systems. When other states were subsequently admitted into the Union, their territorial confines were "carved" from federal territories. The "public lands" owned and reserved by the United States within those territorial confines were not subject to taxation. This reservation by the United States created a serious impediment to the "public land" states in relation to an adequate property tax base necessary to permit these states to operate and maintain essential governmental services, including the public school systems. *It was in recognition thereof, i. e., in order to "equalize" the status of the newly admitted states with that of the original thirteen states, that the Congress enacted the federal land grant statutes. The specific purpose was to create a binding permanent trust which would generate financial aid to support the public school systems of the "public land" states.* The nature of the Congressional land grant program was "bilateral" in effect. It constituted a solemn immunity from taxation of federal lands reserved or retained in ownership by the United States within the territorial boundaries of the newly admitted states in return for the acceptance by the states of the lands granted, to be held and administered by the states under trust covenants for the perpetual benefit of the public school systems.

■ Large quantities of the public domain have been granted by the Congress to the various states either for general or specific purposes. Many of these grants are unrestricted. None, to our knowledge, involve the trust covenants attendant with the state school land grant statutes. A grant by Congress of land to a state for the benefit of the common schools is an absolute grant, vesting title for a specific purpose. *Alabama v. Schmidt*, 232 U.S. 168, 34 S.Ct. 301, 58 L.Ed. 555 (1914). The school land grant and its acceptance by the state constitutes a solemn compact between the United States and the state for the benefit of the state's public school system. *State of Nebraska v. Platte Valley Public Power and Irr. Dist.*, 147 Neb. 289, 23 N.W.2d 300 (1946), 166 A.L.R. 1196. A state accepting the school land grant must abide its duty as trustee for the benefit of the state's public school system. This duty applies with equal

force to those specific school lands granted or those lands selected by the state as indemnity or lieu lands. The indemnity or lieu "selections" by a state arise if any of the lands within the specific congressional grant (usually of sections 16 and 36 in each township) are not available by reason of pre-existing rights of others. *McCreery v. Haskell,* 119 U.S. 327, 7 S.Ct. 176, 30 L.Ed. 408 (1886).

The material facts in the case at bar were stipulated and are not in dispute. Following all pleadings, including the stipulation and pre-trial order, the respective parties moved for summary judgment pursuant to Fed.Rules Civ.Proc., rule 56, 28 U.S.C.A. The trial court entertained oral arguments and considered extensive briefs prior to entry of its Findings of Fact, Conclusions of Law and Decree on June 8, 1976. The trial court held that the discretion to be exercised by the Secretary in acting upon Utah's school land indemnity selection lists is confined to the narrow range set forth in 43 U.S.C.A. §§ 851 and 852. On appeal, the Secretary contends that the trial court erred in not finding that his discretion is very broad pursuant to Section 7 of the Taylor Grazing Act, 43 U.S.C.A. § 315f. A recital of the background leading to the instant dispute should aid our review.

Section 6 of the Enabling Act of Utah, approved July 16, 1894, 28 Stat. 107, grants to Utah sections 2, 16, 32, and 36 in every township in the State for the support of the common schools. It further provides that Utah may select other lands in lieu of those sold or otherwise disposed of.

Congress provided under 43 U.S.C.A. § 851 (R.S. § 2775; Feb. 28, 1891, c. 384, 26 Stat. 796, et seq.) that whenever title to any of the school sections granted to the State of Utah did not pass because of federal pre-emption (reservation) or private entry (homestead settlements), Utah was entitled to ". . . *other lands of equal acreage [which] are hereby appropriated and granted, and may be selected, in accordance with the provisions of section 852 . . . .*" (Emphasis supplied.) Confusion reigned as a result of language contained in the Homestead Act of 1862 (Ch. 75, 12 Stat. 392) which limited *land entries* thereunder to "non-mineral lands." Subsequent mining legislation provided that federal mineral lands were expressly reserved *from sale* except as otherwise expressly directed. The Department of the Interior adopted an administrative interpretation that "known mineral lands" were excluded "by implication" in the Utah Enabling Act. This interpretation was upheld by the Supreme Court in the case of *United States v. Sweet,* 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed. 473 (1918) where the Court held that because the Utah Enabling Act of July 16, 1894, did not make specific mention of mineral lands that the school section grant was not intended to embrace land known to be valuable for "known minerals." This was changed by the Congress under the Act of January 25, 1927, 44 Stat. 1026–1027, as amended, 43 U.S.C. §§ 870, 871 which specifically provided that ". . . the several grants to the States of numbered sections in place for the support or in aid of the common or public schools be, and they are hereby, extended to embrace numbered school sections mineral in character, unless land has been granted to and/or selected by and certified or approved, to any State or States as indemnity or in lieu of any land so granted by numbered sections," and "the grant of numbered mineral sections under this section (§ 870) shall be of the same effect as prior grants for the numbered non-mineral sections, and titles to such numbered mineral sections shall vest in the States at the time and in the manner and be subject to all the rights of adverse parties recognized by existing law in the grants of numbered non-mineral sections." Notwithstanding this legislation, however, Utah was denied title to mineral lands in relation to in-lieu selections resulting from vast withdrawals or other actions taken to make the public lands unavailable for in-lieu selections. The problem appeared to have been resolved in Utah's favor, however, by the passage of 1958 and 1966 amendments to 43 U.S.C. § 852 (Act of August 27, 1958, 72 Stat. 928; Act of June 24, 1966, 80 Stat. 220), following which the statute read:

43 U.S.C.A. § 852 Selections to supply deficiencies of school lands

(a) The lands appropriated by section 851 of this title, shall be selected from any unappropriated, surveyed or unsurveyed public lands within the State where such losses or deficiencies occur subject to the following restrictions:

(1) No lands mineral in character may be selected by a State except to the extent that the selection is being made as indemnity for mineral lands lost to the State because of appropriation before title could pass to the State;

(2) No lands on a known geologic structure of a producing oil or gas field may be selected except to the extent that the selection is being made to indemnify for lands on such a structure lost to the State because of appropriation before title could pass to the State; and . . .

The 194 "In lieu" selection parcels selected by Utah in the instant case were made following the aforesaid Congressional amendments to 43 U.S.C. § 852, *supra.* Accordingly, Utah was entitled to select "in lieu" lands mineral in character *if* the base lands lost to the state were also mineral in character. At oral argument, it was agreed that the 194 "in lieu" selections by Utah were made following Utah's determination, through use of its expertise, that the base lands lost were "mineral in character" and that the selected "in lieu" lands were likewise "mineral in character." We deem it important here to observe that apparently at the time of the selections by Utah *none* of the "base lands" lost and *none* of the "in lieu" lands selected were productive of oil, gas or other minerals. Thus, no contention is presented that any of the lands were "in areas of known geologic structures," or, if so, that any of Utah's in-lieu selections would prejudice pre-existing rights of the United States. It is Utah's contention, then, that the sole and exclusive determination to be made by the Secretary is confined to the ministerial matter of determining whether the base lands lost and the "in lieu" lands selected are "mineral in character" and equal in acreage. Utah argues,

accordingly, that the Secretary is confined to a ministerial review of Utah's selection lists based upon the "mineral in character" criteria and the attendant acre-for-acre measurement, pursuant to the Utah Enabling Act and the provisions of 43 U.S.C. §§ 851, 852. The Secretary contends that pursuant to Section 7 of the Taylor Grazing Act (43 U.S.C. § 315f) he has much broader discretion, i. e., he may "classify" the 194 "in lieu" parcels on the basis of "value-for-value" against the base lands lost to Utah, apparently predicated primarily on the "mineral in character" criteria.

In answer to Utah's allegation in its Complaint filed in the district court that the base lands lost were "mineral in character" the Secretary averred that he lacked sufficient information with which to form a belief; he alleged that he had not made any determination that "lieu lands" were mineral in character. To our knowledge, no such determination has yet been made, even though Utah commenced submitting its selection lists in 1965, the last of which were submitted November 10, 1971.

At oral argument, counsel for the Secretary contended that the Secretary *may* determine, within the broad spectrum of the right to "classify" the "in lieu" lands pursuant to Section 7 of the Taylor Grazing Act, *supra,* to conduct extensive investigations to determine the nature, value, and extent of the non-produced "mineral in character" aspects of both the lost "base lands" and the "in lieu" lands selected in order to ascertain that the "base lands" are of *equal value* to the "in lieu" lands selected. At no time or in anywise has the Secretary seen fit to inform the State of Utah, the district court or this court just how this determination is to be undertaken. Thus, at this time, it seems that we can safely relate—based upon the arguments presented and the record before us—that the criteria, processes and methods for determination of the "equal value" urged by the Secretary are non-existent, or otherwise so vague as to presently fall within the realm of guesswork or speculation. We believe that it is most unlikely that Congress intended to

vest such discretion in the Secretary in light of the historical background leading to the enactment of the "in lieu" statutes heretofore referred to. The procedure prior to the Secretary's interpretation of the applicability of Section 7, *supra*, was that once a state submitted the indemnity selection list identifying the character and description of both the base lands for which indemnity is sought and the identity of the selected lands that the Secretary proceeds to publish notice providing any adverse claimant of the right to challenge the selections prior to execution of a "Clear List" document by which the Secretary certifies that (a) the lands designated as base lands in a selection list were properly categorized and described by the state and (b) the selected lands were in fact unappropriated federal public domain on the date the selection list was filed.

The Act of May 3, 1902, 32 Stat. 188, 43 U.S.C.A. § 853 provides that all of the provisions of §§ 851 and 852, relating to the selection of lands for educational purposes and indemnity therefor are made applicable to the State of Utah.

▇▇ Whereas land grants generally are to be construed favorably to the Government and nothing is held to pass except that conveyed in clear language, (*United States v. Union Pacific Railroad Company*, 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957)), legislation enacted by the Congress designed to aid the common schools of the states is to be construed liberally rather than restrictively. *State of Wyoming v. United States*, 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921). We deem this to be particularly significant in recognition that the sole specific Congressional reference in § 852(a)(1), *supra*, relates to lands ". . . mineral in character may be selected by a State [if] . . . the selection is being made for mineral lands lost to the State because of appropriation before title could pass to the State; . . ." No reference whatsoever is made to the *value* of the "minerals in character." This becomes the more significant, we believe, when we consider that the legislative history to P.L. 89–470, 89th Congress, 2nd Session, reflects,

as do other reports, that the Department of the Interior withdrew its proposed amendment which would have included an equal value concept with respect to lands valuable for leaseable minerals in the place of the existing "acre for acre" selection basis. U.S.Code Cong. & Admin.News, 2nd Session, Volume II, p. 2324 (1966).

The Utah Enabling Act provides that all lands granted for educational purposes (except as otherwise provided therein) shall constitute a permanent school fund. Section 10, 28 Stat. 107, Act of July 16, 1894. The federal grant in trust to Utah for the support of its public school system was accepted by Utah subject to constitutional guaranties that the proceeds of sales of all lands granted for the support of the common schools shall be and remain a permanent fund, the interest of which only shall be expended for the support of the common schools, and any loss or diversion of all public school funds shall be restored. §§ 3 and 7, Article X, Constitution of Utah.

To reiterate, commencing September 10, 1965 through November 19, 1971, Utah filed 194 lieu land selection lists with the Bureau of Land Management, Department of the Interior, covering 157,255.90 acres of land in Uintah County, Utah, to serve as indemnification for school lands in place, mineral in character, which were denied Utah because of federal reservation and preemption or private entry prior to survey. The selection process involved Utah's determination of the "mineral in character" of the lands it had lost and the "mineral in character" of the "in lieu" lands it had selected. We are told and assume that this process required much study and expertise. It is undisputed that Utah's 194 selections were in compliance with the statutory criteria set forth in 43 U.S.C.A. § 852, *supra*. Even so, the Secretary has taken no action with respect to any of them, notwithstanding that many have been pending for a period in excess of ten years.

While the aforesaid 194 selection lists were pending, an agreement was entered into between Utah and the Secretary concerning two prototype oil shale leases issued

by the Secretary embracing some 10,240 acres within the lands selected by Utah. In the course of this litigation, the District Court ordered that all bonus funds and rental proceeds derived from the two leases during the pendency of this action be paid into the registry of the court to be invested as directed by the court; as of May 25, 1976, some $48,291,840.00 had been paid into the district court registry and duly invested.

The District Court summarized Utah's position to be: that the Congress had expressly granted and appropriated lands to Utah to be selected as indemnification for original school lands that Utah did not receive because of federal pre-emption or private entry prior to survey; that the right of selection is in the discretion of Utah and not the Secretary of the Interior; that upon filing school indemnity selection lists in accordance with 43 U.S.C.A. § 852, equitable title to the selected lands vested in Utah; that the Secretary has a narrow range of discretion in reviewing and acting on such selection lists, limited to a ministerial adjudication to determine only whether such lists are in compliance with the criteria of § 852, *supra*; and, if so, the Secretary is obligated to approve said selections and to issue a clear list to the lands selected, thus vesting legal title in Utah. [R., Vol. III, pp. 103, 104.]

The District Court summarized the Secretary's position to be: that he is authorized and obligated by Section 7 of the Taylor Grazing Act, 43 U.S.C. § 315f, to classify lands located within grazing districts to determine whether such disposition is appropriate under applicable public-land laws; that in making such classification, the Secretary is authorized in his discretion to utilize public interest criteria, including a comparison of the value of the base school lands lost with that of the lands selected as indemnification; and, further, that classification in favor of disposition for school indemnity selection is a condition precedent to the vesting of any right, title or interest in any state which makes any such school indemnity selection.

Some of the pleadings relied upon by the trial court in granting summary judgment in favor of Utah which we deem significant are:

(1) Appendix B attached to Utah's motion for summary judgment, which is a copy of a Memo dated September 14, 1962, from the Associate Solicitor, Division of Public Lands, to the Director, Bureau of Land Management, stating, *inter alia*: "In considering an application by a state for indemnity selection under 43 U.S.C. 851, 852, the disparity in values between the lands offered as base and the lands selected cannot be considered . . .. When the state lieu selection statutes were last amended in 1958, it was clear Congress recognized the practice by the states of offering as base for indemnity selection lands of little value for lands of greater value because of the equal acreage (rather than equal value) provisions of that law . . .." [R., Vol. III, p. 42.]

(2) Appendix P attached to Utah's motion for summary judgment, which is a copy of a letter dated February 14, 1974, from then Secretary of the Interior Roger Morton, to then Governor Calvin L. Rampton of Utah, stating, in part: "As you know, the [Department] has not as yet acted upon the [Utah] applications. The principal question presented . . . is whether pursuant to Section 7 of the Taylor Grazing Act, 48 Stat. 1272 (1934), as amended, 43 U.S.C. 315f (1972), the Department may refuse to convey applied-for lands to a State where the value of those lands greatly exceeds the value of the lost school lands for which the State seeks indemnity. In January 1967, the then Secretary of the Interior adopted the policy that in the exercise of his discretion under, *inter alia*, Section 7 of the Taylor Grazing Act, he would refuse to approve indemnity applications that involve grossly disparate values. That policy remains in effect. In the present case, although the land values are not precisely determined, it appears that the selections involve lands of grossly disparate values, . . .." [R., Vol. III, p. 70.]

(3) Appendix Q attached to Utah's motion for summary judgment constituting a letter dated February 15, 1974, from Kent Frizzell, Solicitor, Department of the Interior, to Utah Attorney General Vernon B. Romney wherein Mr. Frizzell stated, in part: "We believe that the 'comparative value' criterion is a valid one with respect to classifying lands for State lieu selection; such classification being authorized by Section 7 of the Taylor Grazing Act, 48 Stat. 1272, 43 U.S.C. § 315f (1972). Accordingly, we intend to apply that criterion when we adjudicate the pending State applications." [R., Vol. III, p. 72.]

(4) Affidavit of Donald G. Prince, Assistant Director of State Lands, State of Utah, with attached copy of Memorandum of February 11, 1943, from the Commissioner of the General Land Office, Department of the Interior to the Secretary which notes, *inter alia* : "Following the 1936 amendment to the Taylor Grazing Act (Section 7 relied upon by Secretary in this action), and the promulgation of Circular 1398 which provides that the States 'should state whether the proposed exchanges are to be based upon equal values or equal areas' that all exchanges for the subsequent five year period were, on the States' election, made on the basis of equal area; *that state indemnity school land selections have always been based on equal areas, regardless of the value of the lease or selected lands, citing to California v. Deseret Water Etc. Company,* 243 U.S. 415 [37 S.Ct. 394, 61 L.Ed. 821] and *Wyoming v. United States,* 255 U.S. 489 [41 S.Ct. 393, 65 L.Ed. 742]." (Emphasis supplied.) [R., Vol. III, pp. 91–94.]

The Secretary vigorously challenges those findings of the District Court limiting the Secretary's authority to classify lands. They include:

*Finding No. 11* : The Taylor Grazing Act was enacted as Public Law No. 482, 73rd Congress, Second Session, identified as the Act of June 28, 1934, 48 Stat. 1269, entitled:

> An act to stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement, and development, to stabilize the livestock industry dependent upon the public range, and for other purposes.

The pertinent part of Section 7 of the 1934 Act provided, with respect to the classification authority of the Secretary of Interior, that:

> . . . the Secretary is hereby authorized, in his discretion, to examine and classify any lands within such grazing districts which are more valuable and suitable for the production of agricultural crops than native grasses and forage plants, and to open such lands to homestead entry in tracts not exceeding three hundred and twenty acres in area.

There is no language in the 1934 Act which purports to give the Secretary of Interior authority to classify lands that are selected by States for indemnification of lost school lands, nor is there anything in the legislative history of the 1934 Act that suggests that Congress intended to require classification as a condition to school indemnity selections.

Further, the trial court found that the Secretary had no authority to compare value of lost lands with value of indemnity lands:

> *Finding No. 12* : The Taylor Grazing Act was amended in 1936 by Public Law No. 827, Act of June 26, 1936, 49 Stat. 1976 et seq. Section 7 of the 1936 Amendment, now codified as 43 U.S.C. 315f, describes the Secretary's classification authority in the following language:
>
> . . . The Secretary of the Interior is hereby authorized, in his discretion, to examine and classify any lands . . . within a grazing district, which are more valuable or suitable for the production of agricultural crops than for the production of native grasses and forage plants, or more valuable or suitable for any other use than for the use provided for under this Act, or proper for acquisition in satisfaction of any outstanding lieu, exchange or script rights or land grant, and to open such lands to entry, selection, or location for

disposal in accordance with such classification under applicable public-land laws, except that homestead entries shall not be allowed for tracts exceeding three hundred and twenty acres in area. Such lands shall not be subject to disposition, settlement, or occupation until after the same have been classified and opened to entry . . . .

The lands selected by Utah, as identified in Finding No. 4, above, are located within grazing districts. But there is nothing in the legislative history of the 1936 Amendment to Section 7 of the Taylor Grazing Act to suggest that classification by the Secretary is a prerequisite to the exercise of school indemnity selection rights by the States. If, however, such classification should be deemed to be a prerequisite to school indemnity selection, there are no statutory criteria for classification of school indemnity selections beyond a required determination as to whether the selected lands are proper for acquisition in satisfaction of indemnity selection rights. In particular, there is nothing in Section 7 or the underlying legislative history to suggest that the Secretary is authorized or empowered to utilize public interest criteria, or to compare the value of lost base lands with the value of indemnity selections, as part of any classification procedure.

[R., Vol. III, pp. 104–106.]

Significant "Conclusions of Law" on the disputed central issue include:

*Conclusion No. 3:* Federal land grants in aid of the common schools of the State of Utah create a solemn and permanent public trust for the use, benefit and support of the public school system in Utah. This public trust was created by the United States, as settlor, granting to the State of Utah, as trustee, sections 2, 16, 32 and 36 within each township within the State of Utah for the permanent benefit of the Utah public school system, as beneficiary of the trust. The instruments which created this trust consisted of the Utah Enabling Act, 28 Stat. 107, as passed by the Congress of the United States, and the Constitution of the State of Utah, which accepted the terms of the trust, as ratified and adopted by the people of the State of Utah.

*Conclusion No. 4:* When original school land grants in place are denied to the State of Utah as a result of federal pre-emption or private entry prior to survey, the State is entitled to select lands of equal acreage from otherwise unappropriated federal lands within the State in lieu of and as indemnification for such lost base lands, pursuant to and in accordance with the criteria and limitations set forth in Section 852, Title 43, United States Code. This selection is to be made by the State in accordance with the congressional offer contained in said Section 852; and, when such selections are duly filed, it is the duty of the Secretary of Interior to make a ministerial adjudication of such selection lists to determine whether they are in accordance with the requirements of said Section 852. If so, the Secretary must honor the state's acceptance of the congressional offer, and thus fulfill the purpose of the public school land trust, by approving said selections; but, if such selections are found not to be in compliance with the congressional criteria contained in said Section 852, the Secretary must deny and reject such selection lists.

*Conclusion No. 5:* If the ministerial adjudication of the school indemnity selection lists, as conducted by the Secretary under said Section 852, reveals that said selection lists were in fact in compliance with said Section 852, then Utah would have acquired equitable title to the lands so selected as of the dates the respective selection lists were filed, and from and after that date Utah would have been entitled to all revenues, rentals, emoluments and benefits arising or accruing from said lands from and after the respective dates when such selection lists were filed.

*Conclusion No. 6:* The language of Section 7 of the Taylor Grazing Act, as amended in 1936 (codified as 43 U.S.C. 315f), cannot reasonably be construed to require classification of lands within grazing districts as proper for disposition in satisfaction of school indemnity selection lists filed under

Section 852 of Title 43, U.S.C.; and there is nothing in the legislative history of the Taylor Grazing Act which indicates or suggests that Congress intended to subject school indemnity selections to the classification procedures of Section 7 of the Taylor Grazing Act.

*Conclusion No. 7:* Even if it should be assumed that Section 7 of the Taylor Grazing Act could be construed so as to require classification prior to disposition of land within a grazing district in satisfaction of school indemnity rights, such a classification would not be a condition precedent to the vesting of equitable title in the State of Utah as of the respective dates that the selection lists were filed; and, further, the criteria which would govern the Secretary in making such classification would be exactly the same as those which he is obligated to utilize in making his ministerial adjudication under Section 852 of Title 43, U.S.C. This result necessarily follows from the fact that Section 7 (43 U.S.C. 315f) requires the Secretary, in making any such classification for lieu selections, to determine whether the selected lands are "proper for acquisition in satisfaction of any outstanding lieu . . . rights or land grant, and to open such lands to . . . selection . . . for disposal in accordance with such classification under applicable public-land laws . . . ." The Secretary is accorded no other or greater range of discretion, and no other criteria are provided by the statute. The Secretary's determination as to whether selected lands are "proper for acquisition" by the State in satisfaction of its indemnity rights would have to be measured by the requirements for such acquisition as set forth in the "applicable public-land law." The applicable public-land law for school indemnity selections is 43 U.S.C. 852, and any classification of lands made by the Secretary under Section 7 for disposition in satisfaction of school indemnity selections would, of necessity, be the same in nature, substance and range of discretion as the ministerial adjudication performed under Section 852. It is for this reason that the result would be exactly the same whether the Secretary

merely conducts the ministerial adjudication of school indemnity lists required under Section 852, or whether he conducts both the adjudication under Section 852 and the hypothetical classification under Section 7 (43 U.S.C. 315f). Since the law does not require the Secretary to do a useless act, and since there would be no point, purpose or benefit in a separate "classification" under Section 7, the Secretary is not required to "classify" the school indemnity selection lands in this action, but should proceed merely to conduct the ministerial adjudication required by 43 U.S.C. 852. Nothing in this Conclusion of Law No. 7 shall be construed as an indication that school indemnity selections are within the scope of the Taylor Grazing Act; and it is expressly concluded that school indemnity selections are not within the scope of, or subject to, that Act.

*Conclusion No. 8:* Any and all regulations promulgated by the Secretary of the Interior inconsistent with these Conclusions of Law, and, in particular, any provisions within Part 2620 or Part 2400, 43 C.F.R., that purport to require classification under the Taylor Grazing Act of school indemnity selections filed under 43 U.S.C. 852, are without authority of law, are contrary to law, and are void and of no force or effect.

*Conclusion No. 9:* In view of the narrow, confined, ministerial range of discretion conferred on the Secretary under Section 852 of Title 43, U.S.C., and by Section 315f of Title 43, U.S.C. (if, indeed, the latter section could be construed to apply at all), the National Environmental Policy Act, 42 U.S.C. 4321 *et seq.,* does not apply to secretarial review and action on school indemnity selection lists. The Secretary must approve those selections if they are in accordance with the congressional grant, appropriation and offer contained in the Utah Enabling Act, 28 Stat. 107, and Sections 851 and 852 of Title 43, U.S.C.

*Conclusion No. 10:* While federal land grants ordinarily are to be narrowly construed in favor of the United States and against the grantee, the reverse rule holds true with respect to school land grants and

indemnity selections, the courts will adopt a liberal interpretation of the applicable statutes in order to honor and fulfill the public trust in aid and support of the common schools, and thus achieve the purpose intended by Congress in granting school trust lands.

*Conclusion No. 11:* The Secretary's failure to take any final action on any of Utah's school indemnity selection lists which are the subject of this litigation, even though many of such selections have been pending before the Secretary for more than ten years, is "agency action unlawfully withheld or unreasonably delayed" within the meaning of Section 706(1), Title 28, U.S.C.

[R., Vol. III, pp. 107–111.]

On appeal, the Secretary contends that the District Court erred in: (1) finding and concluding that the Secretary does not have administrative discretion to classify school indemnity lieu lands based upon comparative market values between selected and base lands by virtue of the 1936 amendment to Section 7 of the Taylor Grazing Act, now codified as 43 U.S.C. § 315f, and (2) assuming jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2), to impound the oil-shale leasing receipts for the two tracts on the selection lists leased per agreement of the parties, in that the Mineral Leasing Act, 30 U.S.C. § 191 dictates and controls the manner of distribution contrary to the order of the court.

## I.

We first consider the Secretary's challenge to the district court's finding and conclusion that the Secretary does not have administrative discretion to classify school indemnity lieu lands based upon comparative market values between selected and base lands by virtue of the 1936 amendment to the Taylor Grazing Act, now codified as 43 U.S.C. § 315f.

The historical background we have heretofore referred to makes it clear that the school land grant statutes were enacted for a specific purpose. The strict "trust" conditions apply exclusively to the school lands granted the states or those selected "in lieu." No identical trust consequences or compact relationships exist with respect to other "lieu land" selections. *See, e. g., Cosmos Exploration Co. v. Gray Eagle Oil Co.,* 190 U.S. 301, 23 S.Ct. 692, 47 L.Ed. 1064 (1903), involving lands owned in fee simple covered by a patent located in a national forest reservation; *Wisconsin Central R. R. Co. v. Price County,* 133 U.S. 496, 10 S.Ct. 341, 33 L.Ed. 687 (1890), involving selection of indemnity lands by a railroad land-grant company; and *Hall v. Hickel,* 305 F.Supp. 723 (D.C.Nev.1969), rev. and remanded on other grounds, 473 F.2d 790 (9th Cir. 1973), *cert. denied, Boothe v. Morton,* 414 U.S. 828, 94 S.Ct. 51, 38 L.Ed.2d 62 (1973), involving "Valentine Scrip" lands. For other "lieu" selection statutes, *see,* 25 U.S.C.A. § 334 (selection rights of Indians residing off of an Indian Reservation) and 43 U.S.C. § 274 (selection rights to be exercised by veterans). The distinction was referred to in the case of *Willcoxson v. United States,* 114 U.S.App.D.C. 203, 313 F.2d 884 (1963). The court was involved in a construction of the Isolated Tracts Act. The court held that § 7, *supra,* authorized the Secretary to employ his discretion relative to disposal of the subject lands. The court recognized that such discretion does not apply to the state in-lieu grants for the benefit of the public schools. Other decisions have recognized the classification powers under § 7, *supra,* under specific statutes.

The Section 7 amendment relied upon by the Secretary for authority to "classify" in the instant case does not specifically refer to "in lieu" selections as indemnity for school land grants; rather, reference is there made to the Secretary's authorization to classify lands within a grazing district to determine if those lands are proper for acquisition in satisfaction of "any outstanding lieu . . . rights or *land grants* . . ." Thus, we are asked by the Secretary to substitute the general language above cited for the unambiguous, clear and unqualified language in 43 U.S.C. § 851, *supra,* which speaks directly to the subject of lieu selections as indemnity for school land grants

lost to the states by use of the specific, unabridged language directing that the states may select ". . . *other lands of equal acreage* . . . in accordance with the provisions of section 852 of this Title, by said State to compensate deficiencies for school purposes . . . ." The distinction between the legal rights attendant upon private "in lieu" exchanges of lands and state "in lieu" exchanges as indemnity for lost school land grants was specially recognized in *Lewis v. Hickel,* 427 F.2d 673 (9th Cir. 1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 451, 27 L.Ed.2d 440 (1971). There, the private exchange provisions of the Taylor Grazing Act were at issue. In their efforts to overturn the decision of the Secretary rejecting their application for a private exchange of lands under the Taylor Grazing Act, the appellants placed "strong reliance" upon *Payne v. New Mexico,* 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680 (1921). The Court stated in this regard:

Appellants place strong reliance upon *Payne v. New Mexico* . . ., a case involving the Secretary's denial of an exchange under an Act granting New Mexico the *right* to select certain lands for the support of the common schools. However, that case and others like it are inapposite since they arose under statutes granting interests in lands once certain conditions had been complied with. *Hence, the power conferred upon the Secretary was merely 'judicial in its nature' (255 U.S., at 371, 41 S.Ct. 333) in the sense that his only function was to ascertain whether the specific conditions had been met.*

*Under the exchange provisions of the Taylor Grazing Act, the power conferred on the Secretary is much broader than that of determining if the applicant has met the conditions prescribed by Congress.* (Emphasis supplied.)
427 F.2d at p. 676.

■ We agree with the finding of the trial court and the rationale in *Lewis v. Hickel, supra,* i. e., that nothing in the language of the Taylor Grazing Act, as amended, or its legislative history, empowers the Secretary to invoke the Section 7 (43 U.S.C. § 315f) "classification" criteria to "in lieu" selections by a state of lands within a grazing district pursuant to the school indemnity selection statutes. We deem it significant that the Secretary has failed to point out that the § 7 classification authority, in any event, relates *only* to surface entry rights. The Act specifically provides that the lands withdrawn for classification remain open to mineral location. 43 U.S.C.A. §§ 315f, 315g(d). The classification power does not extend to the mineral estate.

■ We reiterate that land grant legislation enacted by the Congress designed to aid the common schools of the states is to be construed liberally (in favor of the states) rather than restrictively. *State of Wyoming v. United States, supra.* In *Beecher v. Wetherby,* 95 U.S. 517, 24 L.Ed. 440 (1877), the Supreme Court held that when a state is admitted to the Union and is granted sections 16 in the state upon certain conditions to be ratified by the constitution of the state, and the ratification was made, then the condition became unalterable and obligatory on the United States. This rule is explicit. *See also:* 81A C.J.S. States § 4b. This court cannot engraft an exception thereon favoring the Secretary's administrative discretion claimed here. We thus hold that the district court did not err in its findings and conclusions that the exchange of school lands lost for "in lieu" lands to be selected by Utah is to be undertaken on the equal acreage basis once it is determined that the respective lands are "mineral in character" without regard to valuation. The value-for-value exchange criteria set forth in Section 7, *supra,* does not apply. The legislative history relating to 43 U.S.C. §§ 851 and 852, *supra,* together with that of the 1936 amendment to Section 7 of the Taylor Grazing Act show complete silence on the part of the Congress of any intent to authorize broadening of the Secretary's classification authority respecting the indemnity selection rights of Utah. However, when we review the provisions of 43 U.S.C. §§ 851 and 852, *supra,* it is strikingly clear that Congress did grant the states

broad rights in effecting indemnity selections. There is no question that the "equal acreage" language originally set forth in § 851, *supra,* has been retained throughout its amendatory history. At no time has the Congress used the "equal value" reference.

The trust aspect of the obligation imposed upon and assumed by the respective "public land" states in relation to lands granted for the benefit of the public school system was recently recognized by the United States Supreme Court in *Lassen v. Arizona, ex rel. Arizona Highway Dept.*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967). There, the Arizona Supreme Court was reversed in its holding that the Arizona Highway Department could condemn trust lands acquired by Arizona under § 28 of its Enabling Act for highway construction on the ground that it could be presumed that highways constructed across such trust lands always enhanced the value of the areas taken and that, accordingly, the Highway Department was not required to compensate the trust. The United States Supreme Court emphasized that § 28 of the Enabling Act required that trust lands be sold or leased only to "the highest and best bidder"; that no lands be sold for less than their appraised value; that disposal of trust lands be "only in manner as herein provided"; and that disposition in any other way shall be a breach of trust. The Court held that only sales and leases were intended and that the grant was plainly expected to produce a fund, accumulated by sale and use of the trust lands, with which the state could support the public institutions designated by the Act. The *Lassen* court reaffirmed the rule applied in *Ervien v. United States*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919) recognizing strict concern for the integrity of the trust conditions imposed by the various "public land" state enabling acts. In *Ervien, supra,* the Court held that actual compensation "in money" must be paid the trust equaling the appraised value. The same stringent trust conditions were again reaffirmed by the holding that a lease by Arizona of lands acquired for the common schools under its Enabling Act can only be executed in consideration of a rent-

al representing its "true value." *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976).

The trial court specifically found that there is nothing in the legislative history of the 1936 amendment to Section 7 of the Taylor Grazing Act to suggest that the classification by the Secretary is a prerequisite to the exercise of Utah's school indemnity selection rights. [R., Vol. III, p. 105.] We agree.

■ There are established rules of statutory construction supporting the trial court's conclusion that Section 7 does not control here: A statute must be construed as it was intended to be understood when enacted in the light of the conditions as they existed when the act was passed. *United States v. Stewart*, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40 (1940). Words of a statute are to be interpreted in their ordinary definitions and the meanings commonly attributed to them. *Jones v. Liberty Glass Company*, 332 U.S. 524, 68 S.Ct. 229, 92 L.Ed. 142 (1978). Where there are two statutes upon the same subject, the earlier being special (as is the case with regard to 43 U.S.C. §§ 851 and 852, *supra*) and the later being general (as is the case with regard to the 1936 amendment to the Taylor Grazing Act, 43 U.S.C. § 315f, *supra*) it is settled law that the special act remains in effect as an exception to the general act unless absolute incompatibility exists between the two, and all matters coming within the scope of the special statute are governed by its provisions. *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Missouri, K & T Ry. Co. v. Jackson*, 174 F.2d 297 (10th Cir. 1949); *United States v. Fixico*, 115 F.2d 389 (10th Cir. 1940); Sutherland Statutory Construction, 4th Ed., Vol. 2A § 51.05. The latter authority summarized the general-special acts rule:

General and special acts may be in pari materia. If so, they should be construed together. Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a

more detailed way, the two should be harmonized if possible, but if there is conflict, the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling.

Sutherland Statutory Construction, 4th Ed., Vol. 2A, § 51.05, p. 315.

We submit that the strict, continuing "trust" obligations imposed by the Congress upon the "public land" states (and willingly accepted by them) in the school land grant statutes clearly set these enactments aside as *special acts* completely separate and apart from all other public land grant enactments. In that sense, then, these enactments are set apart and given special, independent treatment, much akin to the special preference and treatment of Indians recognized in *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

 This court has held that a statutory exception should be strictly construed so that the exception does not devour the general policy which the law embodies. *Edward B. Marks Music Corp. v. Colorado Mag., Inc.*, 497 F.2d 285 (10th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975). Statutes are, in all instances, to be construed in a manner so as to effectuate the intent of the enacting body, and an unambiguous statute must be given its plain and obvious meaning. *United States v. Ray*, 488 F.2d 15 (10th Cir. 1973); *United States v. Western Pacific Railroad Company*, 385 F.2d 161 (10th Cir. 1967), *cert. denied*, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 656 (1968). The case of *Bronken v. Morton*, 473 F.2d 790 (9th Cir. 1973) is in point. It involved the issue of the Secretary's power to apply the "comparative value" test of § 7, *supra*, upon denial by the Secretary of the issuance of land patents to holders of "in lieu" selection rights involving "Valentine scrip certificates" issued to compensate lands lost by reason of the Mexican land grant. The "scrip" statute authorized the holder to select an "equal quantity" of certain public lands. The Secretary opted for selection based on "equal value." The court rejected the Secretary's position because the "Valentine" scrip act did not provide "that monetary value of the selected lands" was the criteria.

Applying these rules of statutory construction, we hold that the District Court did not err. Furthermore, we believe, just as did the trial court, that the United States Supreme Court has, in two opinions, clearly and succinctly settled the statutory construction conflict presented here in favor of Utah. A detailed recital of these two opinions follows.

*Payne v. New Mexico, supra,* involved a suit by New Mexico to enjoin the Secretary of the Interior and the Commissioner of the General Section of the Land Office from canceling or annulling a "lieu land selection of that state under a mistaken conception of their power and duty." New Mexico did all that was needed to perfect the selection (just as here). The list was approved by the local land office and sent to the general land office. The list was accepted and approved. One year later the Commissioner directed that the selection be canceled "solely on the ground that in the meantime . . . the base tract . . . had been eliminated from the reservation by a change in its boundaries." The Secretary affirmed the Commissioner. The state appealed. Both offices proceeded on the basis that the validity of the selection was to be tested by conditions existing when they came to examine it and not by those existing when the state made the selection. The Supreme Court held that the conditions existing when the selection was made control. In so holding the Court said that the provision under which the selection was made (the "lost" lands and the "in lieu" lands were non-mineral in character) was one inviting and proposing an exchange of lands whereby the Congress said, in substance, to the state:

If you will waive or surrender your titled tract in the reservation, you may select and take in lieu of it a tract of like area from the unappropriated non-mineral public lands outside the reservation. Ac-

ceptance of such a proposal and compliance with its terms confer a vested right in the selected land which the land offices cannot lawfully cancel or disregard. In this respect the provision under which the state proceeded does not differ from other land laws which offer a conveyance of the title to those who accept and fully comply with their terms.

255 U.S., at p. 370, 41 S.Ct., at p. 334.

Again, in relation to the language "under the direction and subject to the approval of the Secretary of Interior" appearing in the statutes relating to lieu land selection, the Court in *Payne, supra,* noted its prior decision that a claimant to public land who has done all that is required under the law to perfect his claim acquires equitable title to the land which the Government then holds in trust for him. The Court said:

The words relied upon (subject to the approval of the Secretary of the Interior) are not peculiar to this land grant, but are found in many others. Their purpose is to cast upon the Secretary the duty of ascertaining whether the selector is acting within the law, in respect of both the land relinquished and the land selected, and of approving or rejecting the selection accordingly.

255 U.S., at p. 371, 41 S.Ct., at p. 335.

*State of Wyoming v. United States, supra,* involved a suit by the United States to establish title to 80 acres of land and to the proceeds of oil produced therefrom. One of the defendants, the State of Wyoming, claimed under a lieu selection made in 1912. It was against that selection and lease that the United States sought to establish title. Under the Act of July 10, 1890, Congress granted to Wyoming for the support of its common schools Sections 16 and 36 in each township as lands in place, with certain exceptions. The act of February 28, 1891, granted the state, in the event any of the designated lands in place should be included within a public reservation, the privilege to *"waive its right thereto and select in lieu thereof other lands of equal acreage from unappropriated non-mineral public lands outside the reservation and within the*

state. *See: California v. Deseret Water, Etc., Co.,* 243 U.S. 415 [37 S.Ct. 394, 61 L.Ed. 821] (1917); *Payne v. New Mexico, ante* [255 U.S.] 367 [41 S.Ct. 333, 65 L.Ed. 680]. Other laws of general application, §§ 441, 453, 2478, Rev.Stats., require that the selections be made under the direction of the Secretary of the Interior." (Emphasis supplied.) 255 U.S., at 494, 41 S.Ct., at 394.

The State of Wyoming selected the 80 acres in lieu of a tract which had passed to the State under the school grant which was included in a public reservation known as the Big Horn National Forest. The selected in lieu acreage "was vacant, unappropriated, and neither known nor believed to be mineral . . . . 'The state did everything necessary to show a perfect title to the land relinquished and perfect relinquishment thereof to the government, and everything that was required either by statute or regulation of the Land Department' . . . ." 255 U.S., at 494, 41 S.Ct., at 394. The list remained in the General Land Office awaiting the consideration of the Commissioner for about three years. In the meantime, the selected land, and other lands, were included in a temporary executive withdrawal as possible oil land and thereafter the Commissioner declined to accept the selection made by the State of Wyoming and called on the State to either accept a limited surface right-certification or to show that the 80 acres was *still* not known or believed to be mineral. Wyoming claimed that it had been vested with equitable title when the selection was made. Accordingly, Wyoming refused the tender. The Commissioner then canceled the selection on the theory that he was justified in rejecting it by reason of the subsequent withdrawal and oil discoveries in the vicinity. The Secretary of Interior affirmed the Commissioner. In the meantime, Wyoming had issued an oil lease on the selected tract. The oil company (lessee) drilled and obtained successful production of oil some four years after the selection. The Supreme Court posed the issue presented as:

The question presented is whether, considering that the selection was lawfully made in lieu of the state-owned tract contemporaneously relinquished, *and that nothing remained to be done by the State to perfect the selection, it was admissible for the Commissioner and the Secretary to disapprove and reject it on the ground that the selected land was withdrawn two years later under the Act of June 25, 1910, or* still later *was discovered to be mineral land;* that is, to be *valuable for oil.* (Emphasis supplied.)

255 U.S., at p. 496, 41 S.Ct., at p. 394.

The Court held that once Wyoming had complied with lawful "in lieu" selection procedures, there was no power conferred in the Commissioner or the Secretary to withhold the approval in the sense of granting or denying a *privilege to the state,* but rather:

. . . *of determining whether an existing privilege conferred by Congress had been lawfully exercised; in other words, their action was to be judicial in its nature and directed to an ascertainment and declaration of the effect of the waiver and selection by the State in 1912. If these were valid then—if they met all the requirements of the congressional proposal,* including the directions given by the Secretary—*they remained valid notwithstanding the subsequent change in conditions. Acceptance of such a proposal and full compliance therewith confer vested rights which all must respect. Equity then regards the State as the owner of the selected tract and the United States as owning the other; and this equitable ownership carries with it whatever advantage or disadvantage may arise from a subsequent change in conditions whether one tract or the other be affected.* (Emphasis supplied.)

255 U.S., at pp. 496, 497, 41 S.Ct., at p. 395.

The Court equated the "in lieu" selection to a cash entry, citing to *Benson Mining & Smelting Co. v. Alta Mining Co.,* 145 U.S. 428, 12 S.Ct. 877, 36 L.Ed. 762 (1892), for the proposition that when the price is paid the right to the patent immediately arises and the delay in the Land Department relative to administrative processing does not diminish the rights flowing from the purchase. Further, the Court made special reference to its decision in *Daniels v. Wagner,* 237 U.S. 547, 35 S.Ct. 740, 59 L.Ed. 1102 (1915). There the Secretary rejected a lieu selection and ruled that no right attached under the selection unless and until it was approved by him and that he possessed a discretion to reject it and give effect to an intervening change in conditions. The Court did not accept the Secretary's position. The Court held that when selections were made in accord with statutes it was the plain duty of the Secretary to approve them and *that the Secretary's power to approve the lists of selection was judicial in its nature.* 255 U.S., at pp. 502, 503, 41 S.Ct. 333. The most telling, significant and pertinent language of the Supreme Court opinion in *State of Wyoming v. United States, supra,* directly applicable to the contention raised by the Secretary here that the "value for value" criteria is to be employed in approving the "in lieu" selection at issue is:

. . . If these (selections of "in lieu" lands) were valid then (when the selection lists were submitted) . . . they remained valid notwithstanding the subsequent change in conditions (i. e., discovery of oil and production thereof). Acceptance of such a proposal and full compliance therewith confer vested rights which all must respect. Equity then regards the State as the owner of the selected tract and the United States as owning the other; and this equitable ownership carries with it whatever advantage or disadvantage may arise from a subsequent change in conditions whether one tract or the other be affected.

255 U.S., at p. 497, 41 S.Ct., at p. 395.

We believe that until and unless there is commercial production of minerals there is really no definitive means or method of ascertaining comparative *value* of tracts which are "mineral in character." The Supreme Court obliquely recognized this, *su-*

*pra,* by reference to "whatever advantage or disadvantage may arise from a subsequent change in condition whether one tract or the other be affected."

 Thus, we conclude that the solemn bilateral agreement between the United States and the "Land Grant" State of Utah included the unqualified, unambiguous *right* of Utah, upon incorporation in its Enabling Act of the waiver heretofore referred to, coupled with Utah's acceptance of the trust conditions and obligations set forth under Sections 3 and 7, Art. X of its Constitution, to select "in lieu" school indemnity lands which are "mineral in character" for the specific school lands granted which are "mineral in character" but lost to the State. There is no legislative criteria limiting or defining the term "mineral in character." Thus all that is required is that both the "lost" lands and the "in lieu" lands have some identifiable "mineral in character." The Secretary argues, it seems, that the affected "Land Grant" states are to be bound without exception to the stringent trust obligations they have assumed in their administration of the "school lands" granted—or those selected "in lieu"—while the United States Government is not bound to the performance of those covenants it agreed to in consideration for Utah's waiver. We reject this contention. It is unreasonable and contrary to the solemn covenant of the United States Government; it is also in derogation of the plain language employed by the Supreme Court in *State of Wyoming v. United States, supra.*

 The trial court found yet another reason for rejecting the Secretary's position on the application of Section 7 in concluding that:

. . . If, however, such classification (as set forth under Section 7, now codified as 43 U.S.C. § 315f, supra,) should be deemed to be a prerequisite to school indemnity selection, there are no statutory criteria for classification beyond a required determination as to whether the selected lands are proper for acquisition in satisfaction of indemnity selection rights. In particular, there is nothing in Section 7 or the underlying legislative history to suggest that the Secretary is authorized or empowered to utilize public interest criteria, or to compare the value of lost base lands with the value of indemnity selections as part of any classification procedure.

We agree. In our view Section 7 was not directed to school indemnity selection rights because its thrust is to "uses." Section 7 authorizes the Secretary to employ a classification process to determine whether lands within a (Taylor Grazing) grazing district may be adaptable to "uses" having a higher value than grazing. The Secretary was empowered to:

. . . to examine and classify any lands . . . within a grazing district, which are more valuable or suitable for the production of crops for the production of native grasses and forage plants, or more valuable or suitable for any other use than for the use provided for under this Act . . . . .

43 U.S.C.A. § 315f.

School indemnity selections are not proposed "uses" of land. They are selections for the transfer of title and subsequent administration by the states under the solemn trust conditions. Accordingly, the aforesaid "classification" procedures of Section 7 cannot apply to school indemnity selections. Under 43 U.S.C. § 851, *supra,* the Taylor Grazing lands *are appropriated* to the states for indemnity selections. The Secretary is confined to unappropriated lands under Section 1 of the Taylor Grazing Act. 43 U.S.C. § 315. School indemnity selections are not "entries" in the traditional sense. All federal lands in Utah are situate within grazing districts. Thus, we must conclude that if the Secretary's power to "classify" school indemnity lands applies, there are no legislative guidelines or criteria spelling out the scope of such power. The Secretary argues that he has authority under Section 7 to cancel the "in lieu" selections based upon his discretionary power to "classify," but he has not deemed it necessary to spell out the scope or extent of the "classification" power in the case at bar.

In fact, he contends that Section 7 "puts no restrictions on the substance of secretarial discretion." [Brief of Appellant, p. 31.] The Secretary's contention is erroneous. The "classification" criteria were spelled out by the Congress for other types of public land dispositions under the 1936 amendment, i. e., homestead entries and exchange of private land. We agree with Utah that, "It makes no sense to suppose that Congress would spell out conditions and criteria for the exchange of private land for federal land, but would at the same time grant to the Secretary unlimited discretion, with no criteria or guidance, to deny school indemnity selections by classifying the land for retention in federal ownership." [Brief of Appellee, p. 60.] The breadth and scope of the right of "classification" claimed by the Secretary creates the very vagueness condemned in *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). There the Court held that a statute which is so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process. *See also: Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952); Sutherland Statutory Construction, 4th Ed., Vol. 1A, § 21.16.

■ Finally, we reach the Secretary's contention that classification is likely required under Executive Order 5327 issued by President Hoover on April 15, 1930, and Executive Order 6910 issued by President Roosevelt on November 26, 1934. Both constituted withdrawals of all of the vacant, unreserved and unappropriated lands of the public domain subject to certain classification and examination. We have carefully reviewed these orders. We hold that nothing in these orders can be construed to apply to state school indemnity selections.

## II.

■ The Secretary contends that the district court lacked jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2), to impound the moneys realized representing oil-shale leasing receipts which Congress, in

Section 35 of the Mineral Leasing Act of 1920, 30 U.S.C. § 191, had previously appropriated for distribution in a way contrary to the trial court's orders. We disagree. We hold that the District Court did not err by reason of its impoundment and investment orders.

The Secretary, following Utah's indemnity selections, issued two federal mineral leases to third parties on some 5,000 acres out of the lands included in the 194 parcels Utah had selected. Millions of dollars of rentals had been paid to the Secretary by the lessees relating to the oil-shale leases.

Section 35 of the Mineral Leasing Act directs that the Secretary pay all oil-shale leasing receipts into the United States Treasury for later redistribution twice a year in varying percentages to Utah, the federal reclamation fund, and to miscellaneous depositories in the Treasury. Thus, the Secretary contends that nothing in the statutes permits the federal courts from impounding these funds to satisfy some anticipated future judgment not yet rendered. Judicial seizure, contends the Secretary, is a suit against the United States, in this case without its consent. This argument was not raised in the District Court and need not be entertained for the first time on appeal. However, the procedure employed by the District Court appears from the record to have been tacitly consented to by the United States which at no time objected to the orders of the court relative to impoundment or deposit. [*See*, R., Vol. I, p. 69.] In addition, the record reflects that Utah and the Secretary recognized Utah's potential ownership of the leased tracts, together with the lease rentals received, in light of the request by the United States, acceded to by Utah, that Utah consent to the lease transactions pending the outcome of this litigation initiated to resolve the ownership of the lands and the funds. [R., Vol. III, pp. 73, 74.] In our judgment, *Wyoming v. United States, supra*, firmly supports the trial court's action.

Utah has not pursued an action for damages. In addition, the Tucker Act cannot apply in view of the limit of $10,000.00 in

any civil action or claim thereunder against the United States. 28 U.S.C.A. § 1346(a)(2). We deem the action of the District Court entirely consistent with Fed.Rules Civ.Proc. rule 67, 28 U.S.C.A., relative to deposit of the funds with the court and the provisions of 28 U.S.C.A. §§ 2041 and 2042 relating to money deposited and withdrawn.

WE AFFIRM.