The STATE OF UTAH, by and through its Division of State Lands, Plaintiff,

v.

Cecil D. ANDRUS, Individually and as Secretary of the United States Department of the Interior; Frank Gregg, Individually and as Director of the Bureau of Land Management within the Department of the Interior; William Whalen, Individually and as Director of the National Park Service within the Department of the Interior; Robert S. Bergland, Individually and as Secretary of the United States Department of Agriculture; and John McGuire, Chief of the Forest Service within the Department of Agriculture, Defendants.

UNITED STATES of America, Plaintiff,

v.

COTTER CORPORATION, a subsidiary of Commonwealth Edison, Defendant.

STATE of UTAH, by and through its Division of State Lands, Defendant-in-Intervention.

Nos. C 79–0037, C 79–0307.

United States District Court, D. Utah, C. D.

Oct. 1, 1979.

Robert B. Hansen, Atty. Gen., Richard L. Dewsnup, Dallin W. Jensen, Asst. Attys. Gen., Salt Lake City, Utah, for plaintiff.

Ronald L. Rencher, U. S. Atty., and James R. Holbrook, Asst. U. S. Atty., Salt Lake City, Utah, for defendant United States of America.

Dale A. Kimball, Martineau, Rooker, Larsen & Kimball, Salt Lake City, Utah, and John D. Havens, Lakewood, Colo., for defendant Cotter Corp.

Kea Bardeen, and James G. Watt, Denver, Colo., for amicus curiae Mountain States Legal Foundation, Utah Mining Association, Independent Petroleum Association of the Mountain States, and Independent Petroleum Association of America.

Mary Jane Due, Washington, D. C., for amicus curiae American Mining Congress.

## MEMORANDUM OPINION, DECREE AND INJUNCTION

(In Lieu of Findings of Fact, Conclusions of Law, and Order, under Rule 52, F.R.C.P.)

ALDON J. ANDERSON, Chief Judge.

This is a case of first impression involving important questions concerning the administration and use of public lands. Plaintiff, the United States, filed suit on May 25, 1979, seeking a temporary restraining order to prevent Cotter Corporation (hereinafter Cotter) from engaging in "any construction, road building, leveling land, or destroying primitive, scenic and wildlife characteristics" on certain federal land. The court granted the order.[1]

The State of Utah moved to intervene as a party defendant. It was unopposed and the motion was granted by the court. Thereafter, Utah filed an answer to the complaint and a counterclaim, alleging that by denying Utah's lessee (Cotter) access to certain state school trust land (section 36) the United States violated a compact with the state and interfered with its right to fully utilize the school trust land. This was followed with a motion for summary judgment. On June 6, 1979, the state filed a motion to consolidate this case with *Utah v. Andrus*, C 79–0037, (D.Utah, filed January 16, 1979). On finding that consolidation would serve the interests of judicial economy and would not prejudice the parties, the motion was granted.[2]

On July 12, 1979, argument was heard on the request for permanent injunction and the matter was fully submitted, with final briefs filed thereafter.[3] The court has carefully considered the matters presented and is ready to rule.

## FACTS

This case involves access to mining claims located on both federal and state land.[4] The state land is surrounded by land in

---

1. On June 1, 1979, Cotter filed a motion for dissolution of the restraining order claiming that the proposed road was necessary to gain access to mineral leases on a section of state school land and would not cause permanent damage. Argument was heard and the motion was denied. On June 4, 1979, the court extended the temporary restraining order until June 15 when argument could be heard on the motion for preliminary injunction.

2. On June 15 oral argument was heard on all motions. At that time the parties agreed that if the court would hear arguments on a request for permanent injunction that neither the United States nor Cotter would take any further action with regard to the land in question. This included agreement by the United States to withhold any decision on whether or not the area should be designated a wilderness study area.

3. Amicus Curiae briefs were submitted by the Mountain States Legal Foundation and the American Mining Congress.

4. In Cotter's initial letter to the Bureau of Land Management informing the agency of its intent to commence road building, Cotter indicated that the purpose of the road was to gain access to the state school section. (Complaint, Exhibit A.) Cotter continued to assert this purpose in its motion to dissolve the temporary restraining order. Later in the proceedings, however, Cotter argued not only for its right of access to state school lands, but also to its federal mining claims. Therefore, the court has treated the case as if it involved both issues since both issues were subsequently argued by the parties.

federal ownership and land access to section 36 is possible only by crossing federal property. The state land was granted to Utah by the United States under the Utah Enabling Act (Act of July 16, 1894, 28 Stat. 107). The major portion of the land in territorial Utah, at the time of statehood, was in federal ownership. In order to provide a tax base for the new state, the federal government granted to Utah certain sections of land in each township—specifically, sections 2, 16, 32 and 36. But this grant was not unconditional nor was it a unilateral gift. In order to receive the grant, Utah, like other states, was required to use the proceeds of the granted lands for a permanent state school trust fund. Utah met all the conditions of the federal grant [5] and, upon statehood, received the sections of land.[6]

As a result of the state school land grants, the pattern of property ownership in much of Utah represents a checkerboard, with sections of school trust land interspersed within federal land. Since nearly two-thirds of Utah's land is in federal ownership,[7] and since this land frequently surrounds state school sections, the question of access rights and activity on state school and federal land is of utmost importance to both Utah and the United States. In most situations, neither sovereign can take any action with regard to its land holding without impacting the other's land.

On October 21, 1976, the United States Congress passed the Federal Land Policy and Management Act (FLPMA) intended to provide, in part, a new statutory base for the Bureau of Land Management's (BLM) administration of the lands within its jurisdiction. Only a few are pertinent here. Under section 201(a) [43 U.S.C. § 1711(a) (Supp.1979)], the BLM [8] is directed to conduct an inventory of all BLM managed lands and their resource and other values.

Under § 603(a) [43 U.S.C. § 1782(a) (Supp. 1979)], BLM is directed to examine all roadless areas of 5000 acres or more which have been identified during the inventory process as having wilderness characteristics. Based on this review BLM is to recommend to the President whether or not each such area should be preserved as wilderness according to the provisions of the Wilderness Act (16 U.S.C. § 1131 et seq. [1974]). During this period of review BLM is to manage the lands so as to prevent impairment of wilderness characteristics and unnecessary and undue degradation of the environment. (Section 603(c), 43 U.S.C. § 1782(c) [Supp. 1979]). It was against this historical and statutory backdrop that Cotter located its mining claims and began building a road to gain access to those claims.

Cotter Corporation is a uranium mining and exploration company wholly owned by Commonwealth Edison, a public utility serving Northern Illinois. (Affidavit of Erik Bruner, filed June 11, 1979.) Between January and June, 1976, Cotter acquired additional federal claims and the state mineral lease on section 36. (Id.) The federal claims were located pursuant to the Mining Law of 1872 (30 U.S.C. § 22 et seq.).

During that last six months of 1977, Cotter conducted drilling operations on federal land to the north and to the south of the lands at issue here. These operations indicated a "trend" of uranium ore between the two drilling points. Subsequent drilling operations confirmed the trend. In order to conduct these operations, Cotter constructed access roads (Bruner affidavit), but did not notify BLM of the construction activity. In June, 1978, Cotter began to construct a road across the lands in question here in order to further its exploratory drilling.

---

5. Utah Const., Art. X, §§ 3, 7.

6. For a more detailed history of the school land grant as it applied to Utah, see *Utah v. Kleppe*, 586 F.2d 756 (10th Cir. 1978), *cert. granted*, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979).

7. See One Third of the Nation's Land (Public Land Law Review Commission) at 23 (1970).

8. The Act gives the Secretary of the Department of Interior authority to carry out its provisions. In fact this authority has been delegated to the Bureau of Land Management. For the sake of simplicity, the terms "Secretary" and "Bureau of Land Management" are used interchangeably.

In the meantime, BLM proceeded with the inventory and wilderness area examination required by FLPMA. During the review, BLM identified a portion of roadless unit UT–05–236 as being appropriate for designation as a Wilderness Study Area (WSA).[9] The proposed study unit includes the lands in question here. In April, 1979, BLM published the proposed area in the Federal Register and has received public comment on the proposal (Affidavit of Donald C. Pendleton, filed May 25, 1979). As yet BLM has not finally decided to designate the area a formal WSA. The court is informed that in all likelihood the area will be so designated.[10]

When BLM became aware of Cotter's road building activity in June, 1978, it contacted Cotter personnel and advised them of BLM's interest in the area and requested that the road building activity be brought to a halt. Cotter agreed to this request and ceased all construction activity for approximately one year. (Bruner affidavit.) On May 24, 1979, Cotter notified BLM of its intention to begin construction of a road to gain access to section 36 (Complaint, Exhibit A). BLM then instituted this proceeding.

*OPINION*

At stake here are three very important and conflicting interests. The state of Utah has a clear interest in protecting its rights under the grant of school trust lands and in being able to use those lands so as to maximize the funds available for the public schools. Cotter, of course, has an interest in developing its claims in the most economical way possible. Finally, the United States has an interest in preserving for future generations the opportunity to experience the solitude and peace that only an undisturbed natural setting can provide. As noted herein, these public interests conflict. This is reflected in the more narrow questions of statutory interpretation and reconciliation posed for decision. In order to resolve the issues and effect a balance of interests, it is important to examine each interest and its statutory base.

*I. State School Trust Land*

As previously explained, the state school land grants were not unilateral gifts made by the United States Congress. Rather, they were in the nature of a bilateral compact entered into between two sovereigns. In return for receiving the federal lands Utah disclaimed all interest in the remainder of the public domain, agreed to forever hold federal lands immune from taxation, and agreed to hold the granted lands, or the proceeds therefrom, in trust as a common school fund. Thus, the land grants involved here were in the nature of a contract, with a bargained-for consideration exchanged between the two governments. See *Utah v. Kleppe*, 586 F.2d 756, 758 (10th Cir. 1978), *cert. granted* 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979).

Recognition of the special nature of the school land grants is important both in determining the Congressional intent behind the grant and in understanding judicial treatment of similar grants. Generally, land grants by the federal government are construed strictly, and nothing is held to pass to the grantee except that which is specifically delineated in the instrument of conveyance. *E. g., United States v. Union Pacific Railroad Co.*, 353 U.S. 112, 116, 77 S.Ct. 685, 687, 1 L.Ed.2d 693 (1957). But the legislation dealing with school trust

9. The BLM procedure for carrying out the wilderness review portions of FLPMA is as follows: First, the agency identifies roadless areas of 5000 acres or more which have wilderness characteristics. These areas are then designated Wilderness Study Areas (WSAs), and BLM studies each area to determine the suitability of the area for inclusion in the Wilderness System. At this point in its planning, BLM looks at all the potential uses of an area, including the potential for mineral development. After completion of this phase BLM reports to the President its recommendation as to each area's suitability (or lack thereof) for inclusion in the Wilderness System. The President then makes his recommendations to Congress, which makes the final determination.

10. Memorandum Supplementing the Initial Memorandum In Support of Plaintiff's Motion for Preliminary Injunction and Opposing Utah's Motion for Summary Judgment, filed June 8, 1979, at 3.

land has always been liberally construed. *Wyoming v. United States*, 255 U.S. 489, 508, 41 S.Ct. 393, 399, 65 L.Ed. 742 (1921); *Utah v. Kleppe, supra* at 761. Further, it is clear that one of Congress' primary purposes in enacting the legislation was to place the new states on an "equal footing" with the original thirteen colonies and to enable the state to "produce a fund, accumulated by sale and use of the trust lands, with which the State could support the [common schools]". *Lassen v. Arizona Highway Dept.*, 385 U.S. 458, 463, 87 S.Ct. 584, 587, 17 L.Ed.2d 515 (1967).

■ Given the rule of liberal construction and the Congressional intent of enabling the state to use the school lands as a means of generating revenue, the court must conclude that Congress intended that Utah (or its lessees) have access to the school lands. Unless a right of access is inferred, the very purpose of the school trust lands would fail. Without access the state could not develop the trust lands in any fashion and they would become economically worthless. This Congress did not intend.

■ Further, traditional property law concepts support Utah's claimed right of access. Under the common law it was assumed that a grantor intended to include in the conveyance whatever was necessary for the use and enjoyment of the land in question. *Mackie v. United States*, 194 F.Supp. 306, 308 (D.Minn.1961). When a grantor conveys only a portion of his land, and the land received by the grantee is surrounded by what the grantor has retained, it is generally held that the grantee has an easement of access, either by implication or necessity, across the grantor's land. *E. g., United States v. Dunn*, 478 F.2d 443, 444 & n.2 (9th Cir. 1973). Although this common law presumption might not ordinarily apply in the context of a federal land grant, the liberal rules of construction applied to school trust land allow for the consideration

of this common law principle and justify its application here.[11]

■ Therefore, the court holds that the state of Utah and Cotter Corporation, as Utah's lessee, do have the right to cross federal land to reach section 36, which is a portion of the school trust lands. The extent and nature of that right, however, remain to be determined. In order to reach that decision the court must examine the character and extent of BLM's authority under the Federal Land Policy and Management Act.

## II. Federal Land Policy and Management Act

■ FLPMA represents an attempt on the part of Congress to balance a variety of competing interests, including those enumerated above. To some extent, the statute appears to be internally inconsistent, reflecting different concerns of environmentalists, miners, and ranchers. For example, in section 102 [43 U.S.C. § 1701(a)(8) (Supp.1979)] outlining the Congressional declaration of policy, the statute declares it to be the policy of the United States to manage the public lands.

> in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; . . . that will provide food and habitat for fish and wildlife and domestic animals, and that will provide for outdoor recreation and human occupancy and use . . .

The same section declares national policy to be the management of public lands in a manner

> [that] recognizes the Nation's need for domestic sources of minerals, food, timber and fiber from the public lands including implementation of [the Mining and Minerals Policy Act of 1970] section 21a of Title 30 as it pertains to the public lands. [Sec. (12)]

11. The case of *Leo Sheep Co. v. United States*, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979) is not apposite. In that case the United States Supreme Court held that the government had not reserved an access easement in a particular land grant because the government had the power to condemn the land in question. The defendants in this case have no such power.

On their face these two provisions appear contradictory. Indeed, it is difficult to imagine how an agency is both to encourage mining or logging and preserve land in its natural condition. It is only when the statute is viewed in a dynamic rather than a static context, and is viewed as applying to *all* public lands, that the conflict can be resolved. If all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined. Thus, it would be impossible for BLM to carry out the purposes of the Act if each particular management decision were evaluated separately. It is only by looking at the overall use of the public lands that one can accurately assess whether or not BLM is carrying out the broad purposes of the statute. If one's view is expanded to the complex entirety of land management decisions, then the statute is not necessarily internally inconsistent. Some lands can be preserved, while others, more appropriately, can be mined. BLM is not required to fully implement section 21a of Title 30 each time it makes a decision under FLPMA. Consequently, BLM is not obliged to, and indeed cannot, reflect all the purposes of FLPMA in each management action.

Cotter contends that BLM must take all potential values into account when it designates an area as a WSA. The statute, however, envisions a dynamic *process,* not a static one-time-only decision. FLPMA is addressed in part to solving the problem of the lack of a comprehensive plan for the use, preservation and disposal of public lands. S.Rep. No. 94–583, 94th Cong., 1st Sess. 35–6 (1975), U.S.Code Cong. & Admin. News 1976, p. 6175. The purpose of the inventory and the wilderness review is to enable BLM to ascertain the character of the lands within its jurisdiction, and the best use to which particular portions of land can be put—given such things as wilderness characteristics, mineral values, and the nation's needs for recreation, energy, etc. BLM is entitled to address this problem one step at a time. *E. g., Williamson v. Lee*

*Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

■ BLM is not required to immediately balance the mineral values against the wilderness values of a particular piece of land prior to designating the land a WSA. BLM may, consistent with FLPMA, look first at potential wilderness characteristics and then proceed to study the area for all its potential uses prior to formulating its final recommendations to the Executive.

A. BLM's Authority Under FLPMA

Under section 603(c) [43 U.S.C. § 1782(c) (Supp.1979)], BLM is required, during the period of wilderness review, to manage the public land

in a manner so as *not to impair the suitability of such areas for preservation as wilderness, subject,* however to the continuation of *existing mining . . . uses . . . in the manner and degree* in which the same *was being conducted* on October 21, 1976: *Provided,* That, in managing the public lands [BLM] shall by regulation or otherwise *take any action required to prevent unnecessary or undue degradation* of the lands and their resources or to afford environmental protection.

(Emphasis added in part.)

Cotter argues that this language authorizes only one management standard: preventing undue or unnecessary degradation of the environment. It is Cotter's position that the use of the word "impair" "merely gives direction to the existing authority of [BLM] to manage with a view toward environmental protection." (Supplementary Memorandum of Defendant Cotter Corporation In Opposition to Injunction, filed June 25, 1979, at 20.)

The United States, on the other hand, argues that under section 603(c) there are two management standards: one that applies to uses of the land existing on October 21, 1976, and one that applies to uses coming into existence after that date. Under this interpretation, existing uses are to be regulated only to the degree required to

prevent unnecessary and undue degradation. New uses, however, may be (indeed, must be) regulated to the extent necessary to prevent impairment of wilderness characteristics.[12] Obviously, the latter standard is more strict.

■ The Solicitor of the Department of Interior has issued an opinion dated September 5, 1978, (hereinafter referred to as "Solicitor's Opinion") which interprets the effect of section 603(c). Under this interpretation, section 603(c) does indeed mandate two standards, the first of which governs regulation of uses not in existence on October 21, 1976, and the second of which governs uses existing on that date. (Solicitor's Opinion, pp. 11, 16.) Generally, the interpretation of a statute by those charged with its execution is entitled to great deference. E. g., Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Red Lion Broadcasting v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). The court can find no reason not to give such deference in this case.

Further, the Solicitor's interpretation finds support in the Act's legislative history. In the Report [H.Rep. No. 94–1163, 94th Cong.2d Sess. 17 (1976), U.S.Code Cong. & Admin.News 1976, p. 6175] accompanying the House version of what was to become FLPMA, the language of section 603(c) was described as follows:

> While tracts are under review, they are to be managed in a manner to preserve their wilderness character, *subject to continuation of existing grazing and mineral uses and appropriation under the mining laws.* The Secretary *will continue* to have authority to prevent unnecessary and undue degradation of the lands, including installation of minimum improvements, such as wildlife habitat and livestock control improvements, where need-

ed for the protection or maintenance of the lands and their resources . . . . . (Emphasis added.)

It appears to the court that the above passage indicates that the authority to manage lands so as to prevent impairment of wilderness characteristics was meant to be a new addition to the Secretary's continuing authority to regulate all uses so as to prevent undue degradation. Other parts of the legislative history confirm this view.

The Senate version of FLPMA contained no specific wilderness review section. Rather, it included several sections indicating that the inventory and review process would not, in themselves, either change or prevent change in land use management. The Senate Report accompanying this version indicates that the Committee drafting the bill was concerned that existing uses not be terminated *and* that future uses, *including* use as wilderness, not be foreclosed by new activity. S.Rep. No. 94–583, *supra* at 44, U.S.Code Cong. & Admin.News 1976, p. 6175. It appears that the Senate and the House were concerned about devising a way to protect both existing uses and wilderness values present on tracts not subject to existing uses. As interpreted by the Solicitor, section 603(c) reflects that concern. The Secretary's authority to preserve wilderness is subject to existing uses which may not be arbitrarily terminated, nor regulated solely with a view to preserving wilderness characteristics. But the Secretary may continue to regulate such uses in order to prevent unnecessary or undue degradation. On the other hand, activity on lands with potential wilderness value which are not subject to existing uses may be regulated more stringently so as to preserve wilderness characteristics. The Solicitor's interpretation is consistent with the Act's legislative history and reflects the full meas-

12. Initially, there was some argument in this case as to whether or not the area in question could ever meet the definition of wilderness under 16 U.S.C. § 1131 (1974). After the first hearings, however, that argument was not actively pursued by either party. Assuming that the question of the existence of wilderness characteristics is still at issue, the court holds that the government has presented more than sufficient evidence to show that the land in question meets the criteria of 16 U.S.C. § 1131 (1974). Cf. *Parker v. United States,* 309 F.Supp. 593 (D.Colo.1970), *aff'd,* 448 F.2d 793 (10th Cir. 1971), *cert. den.,* sub nom. *Kaibab Industries v. Parker,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972).

ure of Congressional intent in the adoption of 603(c). Cotter's interpretation reflects only one of Congress' concerns, i. e., protection of existing uses.

Finally, the Solicitor's interpretation is supported by the language and structure of the statute itself. The word "impair" would prevent many activities that would not be prevented by the language of "unnecessary or undue degradation."[13] For example, commercial timber harvesting, if conducted carefully, would not result in unnecessary or undue degradation of the environment. See, One Third of the Nation's Land (Public Land Law Review Commission) 102 (1970). But the same activity might well impair wilderness characteristics as those are defined in 16 U.S.C. § 1131 (1971). *Compare Parker v. United States,* 309 F.Supp. 593 (D.Colo.1970), *aff'd,* 448 F.2d 793 (10th Cir. 1971), *cert. den.* sub nom., *Kaibab Industries v. Parker,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972), *with Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292 (8th Cir. 1976). Further, if Congress had not intended to mandate two standards, it would merely have indicated that the Secretary was to continue to manage all lands so as to prevent unnecessary degradation. If one takes the position that this is what Congress intended, then the language of impairment must be mere surplusage. Statutory rules of construction are against such a finding.[14] *Wilderness Society v. Morton,* 156 U.S.App. D.C. 121, 135, 479 F.2d 842, 856 (D.C.Cir. 1973), *cert. den.,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1978).

13. As stated in the amicus brief of the American Mining Congress:

A reasonable interpretation of the word "unnecessary" is that which is not necessary for mining. "Undue" is that which is excessive, improper, immoderate or unwarranted.

Brief of Amicus American Mining Congress in Opposition to the United States' Request for Permanent Injunction, filed July 6, 1979, at 9.

14. There is further indication within FLPMA itself that the Congress intended two management standards. Section 302(b) provides:

Except as provided in 1744, 1781(f) and 1782 [section 603] of this title *and in the last sentence of this paragraph,* no provision . .

Moreover, legislative history confirms that the language of impairment was not surplusage. Initial drafts of the bill in the House did not contain this language; it was added at the suggestion of Congressman Dellenback who stated that the purpose of the language was to keep the Secretary from "changing anything." Its purpose was to maintain the existing character and use of public lands whether that use was wilderness or developed recreation. (Solicitor's Opinion, p. 16).

 Therefore, the court holds that under the terms of FLPMA the BLM has the authority to manage public lands so as to prevent impairment of wilderness characteristics, unless those lands are subject to an existing use. In the latter case BLM may regulate so as to prevent unnecessary or undue degradation of the environment.

## B. Cotter's Rights Under FLPMA

Given that there are two standards by which BLM can manage the public lands, it remains to be determined what standards apply to Cotter's activity. Cotter argues that its activity falls within the existing use provision of 603(c). The main thrust of Cotter's argument is as follows:

1) under the Mining Law of 1872, Cotter has a right of access to its unpatented claims;

2) Cotter, as Utah's lessee, also has a right of access to state school land;

3) these rights, even though not exercised prior to October, 1976, constitute existing uses under FLPMA.

shall in any way amend the Mining Law of 1872 . . . .

The last sentence of 302(b) is as follows:

In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

If the standard of undue degradation were not separate and distinct from the impairment standard contained in section 603(c), there would have been no need to include both the last sentence and reference to section 603(c) in section 302(b). By making distinct reference to both standards in 302(b), Congress indicated its intent to formulate two different approaches to management of the public lands.

■ Section 603(c) mandates that existing uses may continue in the "same manner and degree" as being conducted on October 21, 1976. Unless the statute is referring to activity that was actually taking place on that date, there is no way to give meaningful context to the "manner and degree" language. In order to determine whether or not a given operation is being conducted in the same manner and degree as it was formerly being conducted, there must be *some* former activity against which the extent of the present operation can be measured. Presumably, when the statute refers to existing uses being carried out in the same manner and degree it is referring to *actual* uses, not merely a statutory right to use.

■ Cotter next points to section 302(b) as an indication that its rights of access cannot be denied under FLPMA. Cotter's emphasis in quoting 302(b) is, however, selective. Section 302(b) provides in pertinent part:

> *Except as provided in* 1744, 1781(f) and *1782 [section 603]* of this title and in the last sentence of this paragraph no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators of claims under that Act, including, but not limited to, rights of ingress and egress. (Emphasis added.)

Cotter emphasizes only the latter portion of this section and from this argues that no provision of FLPMA can be taken to amend the Mining Law of 1872. On its face, however, this section makes clear that section 603 *does* amend the Mining Law of 1872. Rights under that law, including rights of ingress and egress, can be impaired by virtue of section 603. Moreover, the Mining Law itself makes clear that rights of access to mining claims are not absolute. Such rights are subject to regulation under 30 U.S.C. § 22 (1971).

It might also be argued that section 201 (43 U.S.C. § 1711 (Supp.1979)) acts as a limitation on BLM's right to restrict Cotter's right of access to its federal claims. Section 201 provides in pertinent part:

> The preparation and maintenance of such inventory or the identification of such areas [of critical environmental concern] shall not, of itself, change or prevent change of the management or use of public lands.

The argument is that since, prior to BLM's inventory, this land was open to all mining activity, section 201 prevents BLM from changing the use to which the land was being put if such change is based solely on the results of the inventory.

In the Report accompanying the Senate version of FLPMA (S.Rep. No. 94–58, *supra* at 44), section 201 is explained as follows:

> The purpose of this statement is to insure that, under no circumstances will the pattern of uses on the national resource land be frozen, or will uses be automatically terminated during the preparation of the inventory and identification of areas possessing wilderness characteristics. Equity demands that the Secretary not be barred from considering and permitting new uses during the lengthy inventory and identification processes. *On the other hand, the "of itself" language is not meant to be license to continue to allow or disallow uses as if no inventory and identification process were being conducted. The Committee fully expects that the Secretary, wherever possible, will make management decisions which will insure that no future use or combination of uses which might be discovered as appropriate in the inventory or identification process . . . will be foreclosed by any use or combination of uses conducted after enactment of S.507, but prior to the completion of those processes.* (Emphasis added.)

It is clear that the Congress [15] intended to provide a balanced solution to the problem

---

**15.** While the legislative history quoted here is from the Senate Report, the House version of the bill contained no similar language. The language was adopted in the conference committee, but without any further indication as to the Congressional intent behind the language. Thus, it is possible to assume that the Senate

of land management during the inventory process. While Congress did not intend the use of public lands to be frozen pending the outcome of the inventory process, neither did it want future uses to be foreclosed by the impact of present activity. Further, the Congress recognized that it might not be possible to both allow present uses and prevent foreclosure of certain other future uses.

This is consistent with the decision in *Parker v. United States, supra.* In that case, involving the Wilderness Act, the court held that the Department of Agriculture could not take any action that would foreclose Congressional consideration of an area's potential for wilderness designation.[16] In this case, if BLM could not prevent activity that would permanently impair wilderness characteristics, then those characteristics could be destroyed before either BLM or the Congress had the chance to evaluate an area's potential uses. This Congress did not intend.

■ Therefore, the court holds that 1) BLM may regulate activity on federal land so as to prevent impairment of potential wilderness characteristics; 2) the authority to so regulate is subject to uses actually existing on October 21, 1976; 3) section 603 does amend the Mining Law of 1872 and subjects rights thereunder to BLM's authority to regulate so as to prevent wilderness impairment; 4) section 201 does not mandate that BLM allow all potential uses to take place on a particular portion of land regardless of wilderness characteristics.

■ BLM's authority is, however, limited to preventing *permanent* impairment of potential wilderness values. Although it is not explicitly provided for in FLPMA, it is consistent with Congress' attempt to balance competing interests and with the Wilderness Act which provides the legislative backdrop for section 603 [17] to find that if a given activity will have only a temporary effect on wilderness characteristics and will not foreclose potential wilderness designation then that activity should be allowed to proceed.

■ The definition of wilderness provided for in the Wilderness Act (16 U.S.C. § 1131[c]) and incorporated by reference into FLPMA in section 603(a) contemplates that some human activity can take place in wilderness areas as long as the area *"generally* appears to have been affected *primarily* by the forces of nature, with the imprint of man's work *substantially* unnoticeable . . . . ."[18]

Further, the draft statement of BLM's Interim Management Policy and Guidelines for Wilderness Study Areas (January 12, 1979, at 9) recognizes that temporary activities, the negative impacts of which could be substantially reversed through appropriate reclamation procedures, would not impair wilderness characteristics under the terms of 603(c).

There has been a great deal of argument in this case over whether or not the effects of Cotter's proposed road and drilling operations can be successfully reclaimed. Un-

---

Report accurately reflects the intent of the Congress, there being no contrary indication.

**16.** Amicus American Mining Congress has cited a portion of legislative history indicating that Congress inserted section 201 into FLPMA with the intent of overruling the *Parker* case. See, Brief of Amicus American Mining Congress in Opposition to the United States' Request for Permanent Injunction, *supra.* It should be noted, however, that the statement quoted by the amicus is from the Senate Committee Report on Senate Bill 424, a bill that was debated some time prior to the debate and passage of FLPMA. Perhaps more important, the final statement of the Senate intent behind including section 201 [or section 102 as it was

in the initial version] contains language almost identical to that quoted by the amicus, *but does not include any reference to the Parker case.* The fact that this language was omitted from subsequent statements of legislative intent argues that Congress, in fact, did not intend to overrule *Parker.* Certainly, without a more definitive statement, this court will not assume that Congress set out to undo that decision.

**17.** Opinion of the Solicitor of the United States Department of Interior, September 5, 1978, at 4.

**18.** 16 U.S.C. § 1131 (1974).

fortunately the factual matters inherent in such an argument have not been sufficiently addressed. At the July 12 hearing on the motion for permanent injunction, Cotter proffered, for the first time, its reclamation plan. BLM has not had the opportunity to review the plan nor to make a comparison of the costs and feasibility of reclamation of a land access route over the cost and effect of other forms of access.

 In view of the court's findings and conclusions of law, the BLM must be given the opportunity to review and· respond to Cotter's reclamation plan. BLM has no formal regulations for review of proposed activity within potential WSA. But BLM is authorized under FLPMA to manage the public lands "by regulation or otherwise . . . ." *See* sections 302(b) and 603(c). Thus, the agency's authority is not dependent on the issuance of formal regulations.[19] Further, in a lawsuit involving issues of the magnitude and importance as those involved here, it is imperative that all parties have the opportunity to respond to critical factual issues. Moreover, the question of the adequacy of a reclamation plan is precisely the kind of question to which the expertise of an administrative agency is most relevant. *Cf. Izaak Walton League of America v. St. Clair*, 497 F.2d 849, 852 (8th Cir.), *cert. den.*, 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974). The court is ill-equipped at this stage of the litigation to make a factual determination on the complex question of the comparative

---

**19.** BLM has argued strenuously that Cotter should be required to "exhaust its administrative remedies" by applying for a right-of-way, having such right-of-way denied, appealing through the Interior system of land board review, and then applying to the court for relief. BLM has also argued that the doctrine of primary jurisdiction ought to apply and that this court should forego action until Interior has had the chance to formally act in the matter. The court does not agree with either argument.

In the first place, there is considerable question as to whether or not a) Cotter is required to apply for a right of way or b) if it is so required, that there is any procedure by which it could have done so. Although BLM now argues that such a procedure exists and that knowledge of the procedure was available to the public, BLM employees previously told Cotter that no such application was required. Further, BLM and Cotter have been negotiating this road for over a year and Cotter was never told to complete a right-of-way application during that time. If no procedure for exhausting administrative remedies exists, then Cotter cannot be penalized for not pursuing such remedies.

Further, there is an exception to the doctrine of exhaustion when it appears that efforts to find relief within the agency would be futile. *Bendure v. United States*, 554 F.2d 427 (Ct.Cl. 1977). Given Interior's position in this case, there is little chance that the agency would do anything but deny Cotter's application. The court will not require Cotter to engage in a useless exercise.

As to the doctrine of primary jurisdiction, the court finds that it does not apply in this case. As defined by the U. S. Supreme Court

"Primary jurisdiction" . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolu-

tion of issues, which, *under a regulatory scheme*, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–4, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (emphasis added). In this case, there is no regulatory scheme beyond the broad provision of FLPMA. Cf. *Izaak Walton League of America v. St. Clair*, 497 F.2d 849 (8th Cir. 1974). That is, BLM has no published adopted procedure through which it would handle Cotter's claim. The doctrine would seem to assume an administrative mechanism through which primary jurisdiction could be exercised. In this case there is no such mechanism. Further, in initiating this suit, BLM did not ask that Cotter be enjoined pending BLM's processing of any application that Cotter might make. It asked the court to *permanently* enjoin Cotter or to enjoin Cotter pending a Solicitor's opinion on the state school land issue. Apparently BLM is not as concerned about the court's taking jurisdiction of this case without any prior Interior action, if the court rules in its favor and permanently enjoins Cotter from any further activity. Under these circumstances, the court finds that the doctrine of primary jurisdiction does not apply in this case. The opportunity given BLM to review the reclamation plan is based solely on the court's perception that BLM should be given the opportunity to respond to the factual issues raised by the reclamation plan and that the court is not equipped to decide this issue raised by the plan at this time. It is not based on Cotter's alleged failure to exhaust administrative remedies nor on the doctrine of primary jurisdiction.

costs and feasibility of reclamation efforts over other forms of access. Thus, the court orders that BLM must be given the opportunity to expeditiously review Cotter's reclamation plan with a view to determining whether or not the impact of the proposed road will be temporary or permanent and with a view toward comparing the cost and feasibility of reclamation with the cost and feasibility of alternative forms of access.

If BLM should decide that the effects of the road will, indeed, be permanent, then the parties (and probably this court) may be required to confront this and other disputed issues. In the interest, however, of giving this judgment finality for the purposes of appeal and for purposes of the parties' own planning, the court chooses not to keep jurisdiction over the lawsuit. The court is aware that should BLM delay reviewing the reclamation plan or make a decision contrary to Cotter's interest, that the parties may need to institute a new lawsuit in order to obtain a final resolution of their dispute. In that event, the court will give the new lawsuit the highest priority and will handle the matter as expeditiously as possible. However, in light of the possibility that further litigation will be necessary, and in light of the fact that throughout the litigation BLM has assumed that the effects of the road would be permanent and thus has put the questions of regulation of access to federal and state land at issue, the court will address the questions remaining in the lawsuit.

*III. FLPMA and the State School Lands*

 The state must be allowed access to the state school trust lands so that those lands can be developed in a manner that will provide funds for the common schools. Further, because it was the intent of Congress to provide these lands to the state so that the state could use them to raise revenue, *Lassen v. Arizona Highway Dept., supra,* the access rights of the state cannot be so restricted as to destroy the lands' economic value. That is, the state must be allowed access which is not so narrowly restrictive as to render the lands

incapable of their full economic development.

 The state's right of access is not, however, absolute. Under the Constitution Congress has the authority and responsibility to manage federal land. U.S. Const. Art. IV, § 3, cl.2. Through statute Congress has delegated this authority to agencies such as the Bureau of Land Management. *Cameron v. United States,* 252 U.S. 450, 459–60, 40 S.Ct. 410, 412, 64 L.Ed. 659 (1920). There is nothing in the school land grant program that would indicate that when Congress developed the school land grant scheme it intended to abrogate its right to control activity on federal land. Further, it is consistent with common law property principles to find that the United States, as the holder of the servient tenement, has the right to limit the location and use of Utah's easement of access to that which is necessary for the state's reasonable enjoyment of its right. *See, e. g., United States v. Hughes,* 278 F.Supp. 733 (E.D. Tenn.1967). Thus, the court holds that, although the state of Utah or its lessee must be allowed access to section 36, the United States may regulate the manner of access under statutes such as FLPMA.

The United States has argued here that not only can the United States regulate Utah's route across federal land, it can also prevent access if it finds that such access would impair wilderness characteristics. The state counters by arguing that if such access can be prevented under FLPMA, then the statute violates the Fifth Amendment by accomplishing taking of property without just compensation.

 The court has already rejected the argument made by the government based on an analysis of the Congressional intent behind the school land grants. The court further finds that the school land grants were accomplished under what is termed "special" legislation. Under statutory rules of construction, when "special acts" conflict with acts which deal with the same subject matter in a more general way, the special acts are to prevail, regardless of whether the special acts were passed prior to or

after the general act. See *Utah v. Kleppe, supra* at 768–69. Of course, this rule does not apply if there is some indication that Congress intended to modify the special act. There is, however, no such indication in the legislative history of FLPMA. Indeed, the terms of FLPMA itself would indicate that Congress did not intend to amend rights under the school land grant program. See section 701(g)(6) (codified at 43 U.S.C.A. § 1701 note (Supp.1979)).

▮ Thus, the court finds that 1) BLM can regulate the method and route of access to state school trust lands; 2) this regulation may be done with a view toward preventing impairment of wilderness characteristics (assuming no existing use);[20] 3) the regulation may not, however, prevent the state or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development.

*IV. FLPMA and Access Rights Over Federal Land*

Section 701(h) [codified at 43 U.S.C.A. § 1701 note (Supp.1979)] of FLPMA provides:

All actions by the Secretary concerned under this Act shall be subject to valid existing rights.

The Solicitor has interpreted this section to mean that valid existing rights cannot be taken pursuant to section 603. (Solicitor's

Opinion, p. 32).[21] The court agrees with this interpretation. The court has also found, however, that Cotter's right of access to both its federal and state claims can be regulated.

The parties have stipulated that "Cotter's proposed road appears to be the only feasible and least environmentally disruptive *land access* for Cotter to its targeted drilling sites *and* for entry into state section 36 . . . ." (Joint Pretrial Stipulation, filed July 9, 1979; emphasis added in part). Thus, in this case, regulation to prevent wilderness impairment could result in total prohibition of land access. BLM has contended that helicopter access is available, feasible and acceptable to the agency. Cotter contends that such access would be prohibitively expensive and would not result in any substantial saving of the environment. This issue was not, however, the subject of live testimony with full cross-examination. The court is not, therefore, provided with sufficient information on which to base a ruling. To further complicate the case, it is not clear that the entire proposed road is necessary for Cotter to gain access to section 36.[22] This is important because different criteria may be applied to judge the propriety of regulation of state, as opposed to federal, access rights. It may be that requiring helicopter access to section 36 would be sufficiently expensive so as to render minerals on that section incapable of

**20.** The Court had also assumed, and now holds, that Utah's right of access to the state school land is not, in this case, an existing use since the right was not exercised prior to October 21, 1976.

**21.** The Solicitor also states that such rights may not be condemned. Without further explanation, the court cannot determine why such rights could not be condemned, assuming just compensation was paid. Certainly, there does not seem to be anything on the face of section 701(h) that would prevent condemnation of and payment for existing rights. Thus, the court does not adopt this portion of the Solicitor's opinion.

**22.** Cotter has asserted that because of the section's terrain it cannot cut across the section. Rather, it must enter from two points: one on the north, the other on the south. *See* Affidavit of Erik Bruner, filed June 11, 1979. This is,

however, a mere conclusory allegation. Without further information it is impossible to know whether it would be more expensive to cut through section 36 from north to south, prohibitively expensive, or physically impossible to do so. Even if it would be physically impossible, there still remains the question of whether access to one portion of the section is sufficient to prevent an abrogation of Utah's access rights.

It is also true that the parties stipulated that the proposed road was the only feasible route to the federal claims and section 36. It is not clear from this stipulation, however, that the United States agreed that the entire road was necessary to gain access to section 36 alone. Further, the government now vigorously contends that it was unaware of the extensions to section 36 until this lawsuit began.

economic development. Therefore, requiring such access and denying land access would violate the intent of the school trust grant. It may be, however, that requiring such access to federal claims would not be so expensive as to constitute a taking under 701(h). If the entire road is not necessary to gain access to section 36, then it could be that substantial parts of it could be prohibited, while other parts could not. Unfortunately, on the record as it now stands, this matter is far from clear.

■ Finally, the record contains very little factual information relevant to the taking issue. The court recognizes that a government can regulate without engaging in a taking. The court also recognizes, however, that when regulation reaches the point of seriously impinging on "investment-backed expectations," it can constitute a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Goldblatt v. Hempstead*, 364 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Given its current information, the court feels that there is a substantial question of a taking in this case if access to federal claims are indefinitely prohibited or if alternative access is unreasonably expensive. The facts in this case are not, however, sufficiently clear at this time for the formulation of a ruling on this matter.

■ In sum, the court holds that Utah does have a right of access to state school trust lands. That right is subject to federal regulation when its exercise requires the crossing of federal property. Such regulation cannot, however, prohibit access or be so restrictive as to make economic development competitively unprofitable. Further, the court holds that BLM may regulate federal public land so as to prevent impairment of wilderness characteristics. Such authority is, however, subject to uses which were existing on October 21, 1976. These uses must have been actually existing on that date. Cotter's right to gain access was not an existing use on October 21, 1976. Therefore, Cotter's activity may be regulated so as to prevent wilderness impairment. But such regulation cannot be so restrictive as to constitute a taking. Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, DECREED AND DECLARED that the State of Utah, and Cotter Corporation as its lessee, have a right of access to state school section 36, which section is more precisely described in Exhibit A of the complaint filed herein. That right is subject to reasonable regulation by the United States Department of the Interior to prevent impairment of wilderness characteristics, but without damaging the competitive economic development of it. The United States may not, in carrying out such regulation, prohibit access. But the United States may, within the limits of the state school land grants and the Due Process Clause of the Fifth Amendment, review and regulate the proposed nature and location of access roads.

IT IS FURTHER ORDERED, ADJUDGED, DECREED AND DECLARED that Cotter Corporation, as the owner of certain unpatented mining claims on federal land, more precisely described in the complaint filed herein, has a right of access to its mining claims. That right is subject to regulation by the United States Department of the Interior to prevent impairment of wilderness characteristics. In carrying out such regulation the United States may not permanently deprive Cotter Corporation of access to its claims. But the United States may, within the limits of the Due Process Clause of the Fifth Amendment, prescribe the mode of access and the location of access roads, if any.

IT IS FURTHER ORDERED, ADJUDGED, DECREED AND DECLARED that the United States Department of the Interior must be given the opportunity to review Cotter Corporation's proposed reclamation plan and the necessity of constructing the entire proposed road to gain access to section 36. Therefore, Cotter Corporation is hereby enjoined from engaging in any construction, road building, leveling land or destroying primitive, scenic and wildlife characteristics on certain federal land as described in the complaint filed

herein until such time as the Department of the Interior has reviewed the reclamation plan and the proposed extensions of the road into section 36 and rendered a decision thereon. At such time as the Department's decision is rendered, the parties may pursue such further remedies before this court as they deem necessary.