**SIERRA CLUB, a non-profit California corporation; and North Cascades Conservation Council, a non-profit Washington corporation, Plaintiffs,**

v.

**James G. WATT, individually and as Secretary of the Department of the Interior; Russell E. Dickenson, individually and as Director, National Park Service; Robert Buford, individually and as Director, Bureau of Land Management, Defendants,**

**and**

**Utah Mining Association, a non-profit Utah corporation, Intervenor.**

**Civ. No. C82–054A.**

United States District Court,
D. Utah, C.D.

April 6, 1983.

Wayne G. Petty, Salt Lake City, Utah, H. Anthony Ruckel, Sierra Club Legal Defense Fund, Denver, Colo., for plaintiffs.

Brent D. Ward, U.S. Atty. for Utah, Salt Lake City, Utah, for defendants.

Keith Taylor, Salt Lake City, Utah, for intervenor.

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANT AND DEFENDANT INTERVENOR

ALDON J. ANDERSON, Chief Judge.

On December 21, 1981, the Bureau of Land Management and the National Park Service published a final rulemaking at 46 Fed.Reg. 62038, providing for "oil and gas leasing and *leasing of minerals other than oil and gas* within five National Recreation Areas (NRA's), Glen Canyon, Lake Chelan, Ross Lake, Wiskeytown, and Lake Mead. The effect of the regulation is the allowance of leasing of so-called "locatable" minerals, i.e., minerals that are normally obtained by patent under the Mining Laws and not by leasing under the Mineral Leasing Act of 1920. In January of 1982 plaintiffs filed the instant action seeking declaratory and injunctive relief from the regulation. Plaintiffs' Amended Complaint included fourteen claims. On July 26, 1982, plaintiffs filed for summary judgment on nine of those fourteen claims. On August 4, 1982 defendant intervenor, Utah Mining Association (UMA) filed for summary judgment on those of plaintiffs' claims that challenged the regulation as it applied to Lake Mead. On October 1, 1982 the federal government on behalf of the defendants filed a Motion for Summary Judgment as to all of plaintiffs' claims.

On November 15, 1982 plaintiffs filed an Amended Motion for Partial Summary Judgment wherein, in effect, plaintiffs conceded in the government's favor as to all of their claims except those that related to Lake Mead NRA and Lake Chelan NRA. On January 11, 1983, after receiving a concession from the government that the regulations would not apply to Lake Chelan NRA, plaintiffs filed a second Amended Motion for Partial Summary Judgment which sought judgment in their favor as to counts 1, 2, 7, 10, 14 of their Complaint, as those counts relate to Lake Mead NRA. Since defendants and the UMA also seek summary judgment as to the same counts, a brief description of them is appropriate.

In count 1 of their Complaint, plaintiffs contend that the regulations violate Article IV, Section 3, Clause 2 of the U.S. Constitution because they were not authorized by the General Mining Law, 30 U.S.C. § 21 et seq., the Mineral Leasing Act, 30 U.S.C. § 181 et seq., the Common Varieties Act, 30 U.S.C. § 601 et seq., or any other statute.

In count 2 of their Complaint, plaintiffs contend that the regulations are inconsistent with the purposes of the National Park System and are therefore unlawful.

In count 7 of their Complaint, plaintiffs contend that the regulations violate the legislation that dedicated Lake Mead NRA to recreational and scenic uses, and in count 10 of the same Complaint they contend the regulations violate the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq.

In count 14 of their Complaint, plaintiffs end their challenge by alleging that the promulgation of the regulations was arbitrary and capricious within the meaning of the Administrative Procedures Act (APA), 5 U.S.C. § 706, and consequently should be overturned.

The court took the matter under advisement at the close of oral arguments, and having carefully considered and reviewed those arguments and the memoranda in the file, the court is of the opinion that plaintiffs' counts fail for the reasons noted below and that, accordingly, defendants' and UMA's Motions for Summary Judgment ought to be granted, and that plaintiffs' action ought to be dismissed with prejudice.

## 382

### Counts One and Seven

The critical issue to be addressed in these two counts of plaintiffs' Complaint is whether the leasing of "locatable minerals" at Lake Mead NRA is consistent with or violative of the Congressional intent expressed in the Lake Mead NRA Act of 1964, Pub.L. No. 89–670.

Disposition of minerals in Lake Mead NRA is controlled by Section 4(b) of the Lake Mead NRA Act of 1964, 16 U.S.C. § 460n–3(b). The section states:

> In carrying out the functions prescribed by Sections 460n to 460n–9 of this title, in addition to other related activities that may be permitted hereunder, the Secretary may provide for the following activities, subject to such limitations, conditions, or regulations as he may prescribe, and to such extent as will not be inconsistent with either the recreational use or the primary use of that portion of the area heretofore withdrawn for reclamation purposes:
> (1) General recreation use, . . .
> (2) Grazing;
> (3) *Mineral Leasing;*
> (4) Vacation cabin site use, . . .

The federal government argues that the words "mineral leasing" give it the necessary authority to lease any and all types of minerals. The plaintiffs counter that a special "CODE" has developed in Natural Resource Law that specifies that wherever words "mineral leasing" are used, it only grants authority to lease minerals specifically set out in the Mineral Leasing Act of 1920. That is, the plaintiffs note that over the years Congress has evolved a system which generally places minerals in one of three classifications: locatable or hardrock minerals (generally disposed of through the General Mining Laws); leasable minerals (minerals such as oil and gas that are specifically listed in, and disposed of through, the Mineral Leasing Act); and common varieties or salables (generally disposed of through the Common Varieties Act). The plaintiffs further note that when Congress passed the enabling acts for the other National Recreation areas (e.g. Grand Canyon)

it stated that the Secretary could lease "nonleasable" minerals, thereby demonstrating that Congress understood the difference between "leasable minerals" and "nonleasable minerals."

■ If the Lake Mead Act were being examined on a clean slate, the court would tend to give greater strength to the plaintiffs' arguments. However, the history of natural resource development in the Lake Mead area demonstrates that the "code," if it exists at all, does not control and that Congress did indeed intend to give the Secretary of Interior the authority to lease "locatable" minerals in that area.

When the Lake Mead Act was passed in 1964, Congress provided that the area "shall continue to be administered in accordance with regulations heretofore issued by the Secretary of Interior." Pub.L. No. 89–670, § 6 (1964). The Secretary had consistently taken the position up to that point in time that he had authority to lease "locatable minerals" and had drafted regulations to carry out such leasing.

The plaintiffs dispute the significance of the historical actions of leasing locatable minerals at Lake Mead. Further, plaintiffs state that Congress did not know that the Secretary had departed from the "Code" disposition of minerals and, as such, when they stated "shall continue to be administered . . ." did not intend to continue the leasing of locatable minerals in that area. In addition, plaintiffs argue that the Secretary has *never* been authorized to lease "locatable" minerals and that, accordingly, the regulations in effect at the time of passage of the Lake Mead Act were null and void and Congress could not have intended to continue such practice.

It is the court's opinion that the plaintiffs' "no authority" argument is essential to their arguments in Counts 1 and 7, since if the Secretary had authority to lease locatable minerals prior to 1964, it would appear from the legislative history of the Lake Mead Act passed in that year that Congress did not intend to take away that

authority by employing the words "mineral leasing."

To determine the Secretary's pre-1964 authority, it is necessary for the court to interpret the following statute:

The Secretary, in his discretion, may (a) permit the removal ... of sand, gravel, and other minerals and building materials with or without competitive bidding ....

43 U.S.C. § 387. (Deleted portion dictates that the removal must be from lands set aside for irrigation projects.)

The Secretary of Interior has interpreted the "other minerals" language of Section 387 as being an authorization by Congress to lease locatable minerals. The plaintiffs counter by stating that the interpretation of the words "other minerals" should be governed by the rule of *ejusdem generis.* That is, plaintiff argues that under the rule of *ejusdem generis* "other minerals" clearly means building materials such as sand and gravel, and should not be interpreted as a carte blanche authorization to lease all types of materials.

■ The difficulty with the plaintiffs' interpretation is that the statute expressly includes "and building materials," thereby opening up the words "other minerals" to a meaning other than construction-type materials. At best, therefore, the plaintiffs' arguments demonstrate that 43 U.S.C. § 387 is ambiguous as to the authority of the Secretary to lease locatable materials. Where a statute is ambiguous, the court is obliged to give deference to the interpretation given the statute by the agency charged with its administration, as long as that interpretation is reasonable. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). See also *Denny v. Hutchinson Sales Corp.,* 649 F.2d 816, 819 (10th Cir.1981); *Blue Cross Assn. v. Harris,* 664 F.2d 806, 810 (10th Cir.1981); *Utah v. Andrus,* 486 F.Supp. 995 (D.Utah 1979). Since the Secretary's interpretation of Section 387 is a reasonable one, the court is of the opinion that the regulations promulgated under that section, that authorizes the leasing of "locatable" minerals, are valid. Further, since Congress, in passing the

Lake Mead Act, stated that the Lake Mead NRA would continue under the "regulations heretofore issued by the Secretary of Interior," it is appropriate to interpret the Lake Mead Act as authorizing the leasing of "locatable" minerals as well.

Accordingly, since it appears that Congress has authorized the leasing of *all* minerals in the Lake Mead area, summary judgment ought to be granted in favor of the defendants and the UMA on Counts 1 and 7 of plaintiffs' Complaint.

*Count Two*

Briefly, the second count of Plaintiffs' Amended Complaint states the regulations violate the organic legislation that established the National Park Service. Specifically, the plaintiffs claim that:

Defendants' action in opening the aforementioned [NRA] ... to exploration for the development of locatable minerals is inconsistent with and contrary to the purposes of the National Park System; it violates the high values and high level of protection afforded National Park System lands by statute; and it is in derogation of the purposes for which the subject [NRA was] established.

Defendants' action is therefore unlawful.

Complaint, ¶ 24.

Both the UMA and the defendants contend that Count two should be dismissed, since the statute that plaintiffs claim the regulations have violated (16 U.S.C. §§ 1 and 1a–1, National Park Service Organic Act) specifically states an exception to the standards of park protection cited in that statute. The Act states:

The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these areas have been established, *except as may have been or shall be di-*

*rectly and specifically provided by Congress.* (emphasis added.)

16 U.S.C.A. § 1a–1 (Supp.1982).

█ The court has determined that Congress has authorized the leasing of "locatable" minerals at Lake Mead NRA. Further, a reading of the regulations demonstrates that under those regulations themselves the defendants cannot issue any lease that will have a "significant adverse effect on the resources or administration of the area pursuant to the authorizing legislation of the area." 46 Fed.Reg. 62043, 44. There has been no indication that the defendants will fail to follow the regulation as written. Further, there is no dispute that if the defendants do fail to follow the regulation in issuing leases, the plaintiffs may bring a separate action challenging such leases. Accordingly, for the reasons stated above, summary judgment ought to be granted in defendants' favor as to Count 2 of plaintiffs' Amended Complaint.

### Count Ten

In regard to Count 10 of their Complaint, plaintiffs argue that under Section 67 of the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq., only the Nuclear Regulatory Commission has authority to lease uranium and other "source material," as defined in Section 11 of the Act, 42 U.S.C. § 2014(2), in lands administered for the national park purposes. This authority can only be exercised, however, "when the President by Executive Order declares that the requirements of the common defense and security make such action necessary." 42 U.S.C. § 2097. Since no Executive Order has been issued regarding Lake Mead NRA, plaintiffs contend that the regulations, to the extent they authorize the leasing of uranium and "source material," violate the Atomic Energy Act.

█ The difficulty with plaintiff's arguments is found in the legislative history of the Atomic Energy Act. That history demonstrates that in passing the Act, Congress intended that the leasing provisions of the Act were only meant to supplement, not overturn, other mineral leasing provisions.

That is, Congress intended that the leasing provisions of the Atomic Energy Act, which provisions require an Executive Order, would apply only where there was no other authority for the leasing of "source material." Since Congress has given the Secretary of the Interior the authority to lease *all* minerals at Lake Mead NRA, the Atomic Energy Act is not applicable to that area.

Accordingly, plaintiffs' tenth count should be summarily dismissed.

### Count Fourteen

Plaintiffs' final argument, in count fourteen of their Complaint, is that the promulgation of the regulations was arbitrary and capricious within the meaning of the APA, 5 U.S.C. § 706.

█ The standard of review to determine if an agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise is not in accordance with law," 5 U.S.C. § 706(2)(A), is a highly deferential one and presumes agency action to be valid. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.1976). The Court cannot substitute its own judgment for that of the agency and will not overturn the action if it appears that the action is rational and based on consideration of the relevant factors. See *Citizens,* 401 U.S. at 416, 91 S.Ct. at 823; *Ethyl Corp.,* at 34–37.

█ Having considered the arguments and memoranda, the court is of the opinion that the defendants' promulgation of the regulations was not arbitrary and capricious. Therefore, count fourteen of plaintiffs' Complaint should also be dismissed.

Accordingly,

IT IS HEREBY ORDERED: that the motions for summary judgment of defendants and the UMA are granted.

IT IS FURTHER ORDERED that plaintiffs' action be dismissed with prejudice.